# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANCISCO MICHAEL MCELFRESH, | Case No.  1:21-cv-01481-SAB |
| Plaintiff, | ORDER DENYING PLAINTIFF'S SOCIAL SECURITY APPEAL |
| v. | (ECF Nos. 14, 16, 17) |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

## I.

## INTRODUCTION

Plaintiff Francisco Michael McElfresh ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for disability benefits pursuant to the Social Security Act, after remand of Plaintiff's initial appeal on September 18, 2020.  The matter is currently before the Court on the parties' briefs, which were submitted without oral argument, to Magistrate Judge Stanley A. Boone.[1]  For the reasons set forth below, Plaintiff's Social Security appeal shall be denied.

---

[1]  The parties have consented to the jurisdiction of the United States Magistrate Judge and this action has been assigned to the undersigned magistrate judge for all purposes.  (ECF Nos. 9, 10, 11.)

1

## II.

2

## BACKGROUND[2]

3        Plaintiff originally filed a Title II claim on June 4, 2015, alleging disability beginning

4    June 14, 2011, due to anxiety, agoraphobia, depression, ADHD, learning disability, mood swings,

5    arthritis for ankle, ankle swelling, chronic pain, headaches, and lower back pain.  (Admin. Rec.

6    ("AR") 15, 155–61, 1108–09, collectively, ECF Nos. 13-1—13-21.)   That claim was initially

7    denied on September 16, 2015, and upon reconsideration on March 1, 2016.  (AR 15.)  Plaintiff

8    appeared for a hearing before Administrative Law Judge ("ALJ") Matilda Surh on May 14, 2018.

9    (AR 15, 29–60.)  The ALJ denied Plaintiff's claim on August 14, 2018 (AR 15–23); the Appeal

10   Council denied review on April 17, 2019 (AR 1087–92).   On June 13, 2019, Plaintiff appealed

11   the denial to this District.  (AR 1129); McElfresh v. Comm'r of Soc. Sec. (McElfresh I), No.

12   1:19-cv-00823-JLT (E.D. Cal. Jun. 13. 2019).   In that appeal, Plaintiff challenged the ALJ's

13   decision on the bases that she erred in evaluating the medical evidence—including the opinion of

14   his treating physician, Dr. McLain—and that she erred in evaluating the credibility of his

15   subjective complaints.  (AR 1136–37.)

16        On September 18, 2020, the district court granted Plaintiff's appeal and remanded the

17   matter to the agency for further proceedings consistent with its order.  (AR 1134–51); McElfresh

18   I at ECF No. 21.  Specifically, the court found the ALJ was required to identify specific and

19   legitimate reasons for discounting Dr. McLain's opinion in favor of the non-examining State

20   agency consultants, and it rejected the ALJ's proffered reasons—failure to follow through with a

21   neuropsychiatry appointment for several months, despite having staff psychiatrists and other

22   mental health professionals on site; the fact that Dr. McLain seldom saw or examined Plaintiff

23   (approximately four appointments from 2015 to 2017); the assertion that Dr. McLain's opinion

24   was inconsistent with the treatment records, diagnostic tests, and report of symptoms by Plaintiff,

25   with only one citation to a single treatment note in the record; and the finding that Plaintiff's

26   ability to play golf "strongly suggests that the claimant is not as limited as alleged"—did not

27

28

---

[2] For ease of reference, the Court will refer to the administrative record by the pagination provided by the Commissioner and as referred to by the parties, and not the ECF pagination.  However, the Court will refer to the parties' briefings by their ECF pagination.

constitute "clear and convincing" reasons for rejecting the mental and physical limitations identified by Dr. McLain.  (AR 1140–44.)  The court also held the ALJ's adverse credibility finding merely used boilerplate language and summarized the record but did not sufficiently identify the challenged testimony and specific reasons for discounting it.  Further, the court rejected the ALJ's proffered work history reason—that Plaintiff did not stop working because of his alleged pain or symptoms, but because he quit his job in June 2011 in order to move from Arizona to California to be with the mother of his child—based on the finding that Plaintiff initially quitting his job to move to California was not necessarily inconsistent with his allegations of pain.  (AR 1145–50.)

While Plaintiff's appeal was still pending before the district court, Plaintiff filed a subsequent disability claim on March 10, 2020.[3]  On remand, this claim was deemed duplicative of the matter on appeal and consolidated with Plaintiff's original claim.  (See AR 963; see also AR 1274–3426 (supplemented record).)  On April 26, 2021, Plaintiff appeared telephonically before Administrative Law Judge Scot Septer in Fresno, California, for an administrative hearing.  (AR 1002–69.)  Impartial medical experts Arthur Lorber, M.D. and Faren R. Akins, Ph.D also appeared at the hearing, as did vocational expert Bernand M. Preston.  Plaintiff, represented by attorney Howard D. Olinsky, appeared with non-attorney representative Michael Eason.  (AR 963.)  On July 27, 2021, the ALJ issued a decision finding Plaintiff was disabled from May 24, 2016 through August 3, 2017—the period during which Plaintiff was recovering from a broken ankle sustained from falling off a ladder—but that Plaintiff was not disabled prior to May 24, 2016, nor after August 4, 2017.  (AR 963–90.)

Plaintiff initiated the instant appeal in federal court on October 4, 2021, seeking judicial review of the denial of his application for benefits with respect to the times prior and subsequent to the period of disability determined by the ALJ.  (ECF No. 1.)  The Commissioner lodged the operative administrative record on April 18, 2022.  (ECF No. 13.)  On June 2, 2022, Plaintiff filed

---

[3] Also on March 10, 2020, Plaintiff filed a subsequent claim for supplemental security income ("SSI") pursuant to Title XVI.  However, the Appeals Council determined the SSI claim did not involve an overlapping period of time with the instant claim.  Accordingly, Plaintiff's subsequent SSI claim was not considered by the ALJ and is not presently before this Court.  (See AR 963–64.)

an opening brief.  (ECF No. 14.)  On July 18, 2022, Defendant filed a brief in opposition.  (ECF No. 16.)  Plaintiff filed a reply brief on August 1, 2022 (ECF No. 17), and the matter is deemed submitted.

### III.

### LEGAL STANDARD

#### A.    The Disability Standard

To qualify for disability insurance benefits under the Social Security Act, a claimant must show he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment[4] which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Social Security Regulations set out a five-step sequential evaluation process to be used in determining if a claimant is disabled.  20 C.F.R. § 404.1520;[5] Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1194 (9th Cir. 2004).  The five steps in the sequential evaluation in assessing whether the claimant is disabled are:

> Step one: Is the claimant presently engaged in substantial gainful activity?  If so, the claimant is not disabled.  If not, proceed to step two.
>
> Step two: Is the claimant's alleged impairment sufficiently severe to limit his or her ability to work?  If so, proceed to step three.  If not, the claimant is not disabled.
>
> Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1?  If so, the claimant is disabled.  If not, proceed to step four.
>
> Step four: Does the claimant possess the residual functional capacity ("RFC") to perform his or her past relevant work?  If so, the claimant is not disabled.  If not, proceed to step five.
>
> Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow him or her to

---

[4] A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities that are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  42 U.S.C. § 423(d)(3).

[5] The regulations which apply to disability insurance benefits, 20 C.F.R. §§ 404.1501 et seq., and the regulations which apply to SSI benefits, 20 C.F.R. §§ 416.901 et seq., are generally the same for both types of benefits. Accordingly, while Plaintiff seeks only SSI benefits in this case, to the extent cases cited herein may reference one or both sets of regulations, the Court notes the cases and regulations cited herein are applicable to the instant matter.

1
2
      adjust to other work that exists in significant numbers in the national economy?  If so, the claimant is not disabled.  If not, the claimant is disabled.

3   Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).  The burden of proof is

4   on the claimant at steps one through four.  Ford v. Saul, 950 F.3d 1141, 1148 (9th Cir. 2020).  A

5   claimant establishes a *prima facie* case of qualifying disability once he has carried the burden of

6   proof from step one through step four.

7         Before making the step four determination, the ALJ first must determine the claimant's

8   RFC.  20 C.F.R. § 416.920(e); Nowden v. Berryhill, No. EDCV 17-00584-JEM, 2018 WL

9   1155971, at *2 (C.D. Cal. Mar. 2, 2018).  The RFC is "the most [one] can still do despite [his]

10  limitations" and represents an assessment "based on all the relevant evidence."  20 C.F.R. §§

11  404.1545(a)(1), 416.945(a)(1).   The RFC must consider all of the claimant's impairments,

12  including those that are not severe.  20 C.F.R. §§ 416.920(e), 416.945(a)(2); ("SSR") 96-8p,

13  available at 1996 WL 374184 (Jul. 2, 1996).[6]  A determination of RFC is not a medical opinion,

14  but a legal decision that is expressly reserved for the Commissioner.  See 20 C.F.R. §

15  404.1527(d)(2) (RFC is not a medical opinion); 20 C.F.R. § 404.1546(c) (identifying the ALJ as

16  responsible for determining RFC).  "[I]t is the responsibility of the ALJ, not the claimant's

17  physician, to determine residual functional capacity."  Vertigan v. Halter, 260 F.3d 1044, 1049

18  (9th Cir. 2001).

19        At step five, the burden shifts to the Commissioner, who must then show that there are a

20  significant number of jobs in the national economy that the claimant can perform given his RFC,

21  age, education, and work experience.  20 C.F.R. § 416.912(g); Lounsbury v. Barnhart, 468 F.3d

22  1111, 1114 (9th Cir. 2006).  To do this, the ALJ can use either the Medical Vocational Guidelines

23  ("grids"), or call a VE.  See 20 C.F.R. § 404 Subpt. P, App. 2; Lounsbury, 468 F.3d at 1114;

24  Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2001).  "Throughout the five-step evaluation,

25  the ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and

26
27
28

---

[6] SSRs are "final opinions and orders and statements of policy and interpretations" issued by the Commissioner.  20 C.F.R. § 402.35(b)(1).  While SSRs do not have the force of law, the Court gives the rulings deference "unless they are plainly erroneous or inconsistent with the Act or regulations."  Han v. Bowen, 882 F.2d 1453, 1457 (9th Cir. 1989); see also Avenetti v. Barnhart, 456 F.3d 1122, 1124 (9th Cir. 2006).

for resolving ambiguities.' " Ford, 950 F.3d at 1149 (quoting Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995)).

### B.    Standard of Review

Congress has provided that an individual may obtain judicial review of any final decision of the Commissioner of Social Security regarding entitlement to benefits.  42 U.S.C. § 405(g).  In determining whether to reverse an ALJ's decision, the Court reviews only those issues raised by the party challenging the decision. See Lewis v. Apfel, 236 F.3d 503, 517 n.13 (9th Cir. 2001). Further, the Court's review of the Commissioner's decision is a limited one; the Court must find the Commissioner's decision conclusive if it is supported by substantial evidence.  42 U.S.C. § 405(g); Biestek v. Berryhill, 139 S. Ct. 1148, 1153 (2019).  "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion."  Thomas v. Barnhart (Thomas), 278 F.3d 947, 954 (9th Cir. 2002) (quoting Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)); see also Dickinson v. Zurko, 527 U.S. 150, 153 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).  "[T]he threshold for such evidentiary sufficiency is not high."  Biestek, 139 S. Ct. at 1154.  Rather, "[s]ubstantial evidence means more than a scintilla, but less than a preponderance; it is an extremely deferential standard."  Thomas v. CalPortland Co. (CalPortland), 993 F.3d 1204, 1208 (9th Cir. 2021) (internal quotations and citations omitted); see also Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996).  Even if the ALJ has erred, the Court may not reverse the ALJ's decision where the error is harmless.  Stout, 454 F.3d at 1055–56.  Moreover, the burden of showing that an error is not harmless "normally falls upon the party attacking the agency's determination."  Shinseki v. Sanders, 556 U.S. 396, 409 (2009).

Finally, "a reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence."  Hill v. Astrue, 698 F.3d 1153, 1159 (9th Cir. 2012) (quoting Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)). Nor may the Court affirm the ALJ on a ground upon which he did not rely; rather, the Court may review only the reasons stated by the ALJ in his decision.  Orn v. Astrue, 495 F.3d 625, 630 (9th

1  Cir. 2007); see also Connett v. Barnhart, 340 F.3d 871, 874 (9th Cir. 2003).  Nonetheless, it is not

2  this Court's function to second guess the ALJ's conclusions and substitute the Court's judgment

3  for the ALJ's; rather, if the evidence "is susceptible to more than one rational interpretation, it is

4  the ALJ's conclusion that must be upheld."  Ford, 950 F.3d at 1154 (quoting Burch v. Barnhart,

5  400 F.3d 676, 679 (9th Cir. 2005)).

6                                                    **IV.**

7                                    **THE ALJ'S DECISION**

8          The ALJ conducted the five-step disability analysis set forth in 20 C.F.R. § 404.1520(a)

9  and made the following findings of fact and conclusions of law as of the date of the decision, July

10  27, 2021.  (AR 963–990.)   At step one, the ALJ found Plaintiff met the insured status

11  requirements of the Social Security Act through December 31, 2016,[7] and that he had not engaged

12  in substantial gainful activity since June 14, 2011, the alleged onset date of disability.  (AR 967

13  (citing 20 C.F.R. §§ 404.1520(b), 404.1571 et seq.).)  The ALJ applied the remaining disability

14  analysis steps to three separate time periods of medical records, in light of Plaintiff's accident on

15  May 24, 2016: (A) the period prior to May 24, 2016; (B) the period from May 24, 2016 through

16  August 3, 2017; and (C) the period beginning August 4, 2017.  (AR 970–90.)

17          **A.     The Period Prior to May 24, 2016**

18          At step two, the ALJ found Plaintiff had the severe impairments of borderline intellectual

19  functioning, an anxiety disorder, attention deficit hyperactivity disorder ("ADHD"), agoraphobia,

20  depression, asthma, obesity, and peripheral vascular disease for the time period prior and up to

21  May 24, 2016.  (AR 967 (citing 20 C.F.R. § 404.1520(c)).)  At step three, the ALJ found Plaintiff

22  did not have an impairment or combination of impairments that met or medically equaled the

23  severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (AR 967–68

24  (citing 20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526).)  To reach this conclusion, the ALJ

25  considered listings 1.18 (abnormality of a major joint in any extremity), 3.03 (asthma), and 4.12

26  _____

27  [7] A claimant must establish disability on or before the last date of disability insurance coverage in order to be entitled
    to a period of disability and disability insurance benefits.  Here, the ALJ determined from Plaintiff's earnings records
    that he acquired sufficient quarters of coverage to remain insured through December 31, 2016; Plaintiff does not

28  dispute that this is the "date last insured."

(peripheral arterial disease), but did not find any medical evidence in the record documenting such "listing-level severity" of impairments.  (AR 968.)

As to Plaintiff's mental impairments, the ALJ applied the special technique for evaluating the severity of mental impairments by rating Plaintiff's level of impairment in the four functional areas under paragraph B (the "paragraph B criteria"), and found Plaintiff did not have an impairment or combination of impairments that met or medically equaled the criteria of Listings 12.04 (depressive, bipolar and related disorders), 12.05 (intellectual disorder), 12.06 (anxiety and obsessive-compulsive disorders), or 12.11 (neurodevelopmental disorders), because his mental impairments did not result in at least one extreme or two marked limitations[8] out of the four broad areas of functioning.  (AR 968.)  For example, the ALJ concluded Plaintiff did not meet the requirements of listing 12.05 because Plaintiff is capable of participating in standardized testing of intellectual functioning, and the record showed he performs household chores, and his hobbies include watching television and movies, and playing video games.  (AR 969–70 (citing AR 334–41, 2606–20, 3422–23).)

Accordingly, the ALJ determined that, prior to May 24, 2016, Plaintiff had a "mild" limitation in "understanding, remembering, or applying information"; he had a "moderate" limitation in the "ability to interact with others"; he had a "moderate" limitation in the "ability to concentrate, persist, or maintain pace"; and a "marked" limitation in "the ability to adapt or manage oneself."  (AR 968.)  With respect to the moderate limitations, the ALJ noted these findings were supported by a report in the record showing unremarkable psychomotor behavior with an intact memory, a logical thought process and unremarkable thought content.  (Id. (citing AR 330).)  The ALJ deemed the marked limitation appropriate based on intellectual testing that revealed functioning in the borderline range of intellectual ability and the expert testimony of Dr.

---

[8] An "extreme" limitation is the inability to function independently, appropriately, or effectively, and on a sustained basis.  A "marked" limitation is a seriously limited ability to function independently, appropriately, or effectively, and on a sustained basis.  See 20 C.F.R. §§ 404.1520a, 416.920a (describing ALJ's special technique for evaluating paragraph B criteria).  By contrast, the regulations define a "moderate" limitation to mean that "functioning in this area independently, appropriately, effectively, and on a sustained basis is fair."  20 C.F.R. §§ 404, Subpt. P, Appx. 1, 12.00.F.2.c, 12.00F.2.d; see also, e.g., Sandoval v. Berryhill, CIV 17-0641 JHR, 2018 WL 3429920 (D.N.M. Jul. 16, 2018), at *7 (noting only "marked" impairment prevents any interaction; whereas limitation of "moderate to marked" denotes "abilities in these areas are limited, [but] they are not completely absent.").

1    Akins.  (Id. (citing AR 334–41, 1032–44, 2606–20).)

2          The ALJ also considered whether the "paragraph C" criteria were satisfied, and

3    determined that they were not.  (AR 969.)  The ALJ reached this conclusion after reviewing

4    Listings 12.04 and 12.06 and determining Plaintiff's medical record does not include any

5    evidence of a "serious and persistent" condition with evidence of ongoing medical treatment,

6    mental health therapy, psychosocial supports, or a highly structured setting to diminish the

7    symptoms and signs of his mental disorder, with Plaintiff achieving only marginal adjustment.

8    (Id.)  The ALJ noted, for example, there is no evidence Plaintiff had only a minimal capacity to

9    adapt to changes, as he performs household chores and his hobbies include watching television,

10   watching movies, and playing video games.  (Id. (citing AR 3422–23).)

11         Before proceeding to step four, the ALJ determined that, prior to May 24, 2016, Plaintiff

12   had the RFC to perform:

13                 **a range of work at the light exertional level as defined in 20
                   CFR 404.1567(b).[9] Specifically, he was able to lift and carry 20**
14                 **pounds occasionally and 10 pounds frequently, stand and/or
                   walk four out of eight hours in an eight-hour workday, and was**
15                 **able to stand and/or walk for an hour at a time without
                   changing position. The claimant was unable to walk on uneven**
16                 **terrain. He was able to sit for eight hours total in an eight-hour
                   workday and was able to sit for two hours at a time without a**
17                 **change in position. The claimant was frequently able to climb
                   ramps and stairs, but never able to climb ladders, ropes and**
18                 **scaffolds. The claimant could balance on an occasional basis,
                   and was able to frequently able to crawl, crouch, kneel and**
19                 **stoop. The claimant was frequently able to operate foot controls
                   with his right lower extremity, and he should not have worked**
20                 **in environments subjecting him to concentrated exposure to
                   respiratory irritants such as gases, dust, smoke and/or fumes,**
21                 **or extreme cold or warm temperatures. The claimant was
                   further able to work in environments exposing him to**
22                 **unprotected heights. He could perform jobs of a non-complex**

23   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
     [9] Pursuant to the disability regulations:

24
             Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects
25           weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when
             it requires a good deal of walking or standing, or when it involves sitting most of the time with some
26           pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of
             light work, you must have the ability to do substantially all of these activities.  If someone can do light
27           work, we determine that he or she can also do sedentary work, unless there are additional limiting factors
             such as loss of fine dexterity or inability to sit for long periods of time.

28   20 C.F.R. § 404.1567(b).

                                               9

> **nature requiring the performance of no more than simple, routine tasks and could not work in environments requiring fast paced production quotas such as assembly line work. In addition, the claimant could have occasional contact with coworkers, supervisors, and the public.**

(AR 970–71 (citing 20 C.F.R. §§ 404.1529, 404.1527, and SSR 16-3p, <u>available at</u> 2017 WL 5180304 (Oct. 25, 2017)) (emphasis in original).)

At step four, the ALJ found Plaintiff was unable to perform his past relevant work (as a hand packager) prior to May 24, 2016.  (AR 977 (citing 20 C.F.R. § 404.1565).)  At step five, the ALJ noted that, prior to May 24, 2016, Plaintiff was a "younger individual" (age group 18–49); Plaintiff has at least a high school education and is able to communicate in English; and transferability of job skills is not an issue in this case because Plaintiff's past relevant work is unskilled.  (<u>Id.</u> (citing 20 C.F.R. §§ 404.1563, 404.1564, 404.1568).)  Considering Plaintiff's age, education, work experience and RFC, and the VE's testimony, the ALJ determined Plaintiff could perform jobs existing in significant numbers in the national economy, specifically the jobs of:

(1) Price Marker, Dictionary of Occupational Titles ("DOT") 209.587-034, classified as light, unskilled work with a specific vocational preparation ("SVP") of level 2, with approximately 255,237 full-time positions available in the national economy;

(2) Garment Sorter, DOT 222.687-014, classified as light, unskilled work, SVP 2, with approximately 200,132 full-time positions available in the national economy; and

(3) Routing Clerk, DOT 222.587-038, classified as light, unskilled work, SVP 2, with approximately 217,721 full-time positions available in the national economy.

(AR 977–78 (citing 20 C.F.R. §§ 404.1569, 404.1569(a)).)  Therefore, the ALJ found Plaintiff was not under a disability at any time from November 1, 2008 (the alleged onset date), through March 31, 2014 (the date last insured).  (AR 1113 (citing 20 C.F.R. §§ 404.1560(c), 404.1566, and Part 404, Subpart P, Appendix 2; SSR 83-11, <u>available at </u>1983 WL 31252 (Jan. 1, 1983); SSR 83-12, <u>available at </u>1983 WL 31253 (Jan. 1, 1983); SSR 83-14, <u>available at </u>1983 WL 31254 (Jan. 1, 1983); SSR 85-15, <u>available at </u>1985 WL 56857 (Jan. 1, 1985)).)

**B.      The Period From May 24, 2016 Through August 3, 2017**

At step two for this period of time, the ALJ found Plaintiff had the same severe

10

impairments as identified for the time period prior to May 24, 2016 (borderline intellectual functioning, an anxiety disorder, ADHD, agoraphobia, depression, asthma, obesity, and peripheral vascular disease), plus a right ankle fracture, status post open reduction and internal fixation, for the time period beginning May 24, 2016, and continuing up to August 3, 2017.  (AR 978 (citing 20 C.F.R. § 404.1520(c)).)  At step three, the ALJ found Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (AR 979 (citing 20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526).)  Similarly, with respect to the paragraph B criteria, the ALJ concluded that, from June 14, 2011 through August 3, 2017, Plaintiff had a mild limitation in understanding, remembering, or applying information; a moderate limitation in interacting with others; a moderate limitation in concentrating, persisting, or maintaining pace; and a marked limitation in adapting or managing oneself.  (Id.)  The ALJ also considered whether the "paragraph C" criteria were satisfied, and determined that they were not, for the same reasons articulated with respect to the prior time period.  (Id.)

Before proceeding to step four, based on his review and summary of the record pertaining to the time period from May 24, 2016 through August 3, 2017 (see AR 980–81), the ALJ determined that, from May 24, 2016 through August 3, 2017, Plaintiff had the RFC to perform the same range of light work as described for the time period preceding May 24, 2016, with the same limitations, plus the following additional limitation:

> **In addition, he would be off task from work related duties and assignments for 15% of the time during an eight-hour workday.**

(AR 979–80 (emphasis in original).)

At step four, the ALJ found Plaintiff was unable to perform his past relevant work (as a hand packager) during the period of May 24, 2016 through August 3, 2017.  (AR 981 (citing 20 C.F.R. § 404.1565).)  At step five, considering Plaintiff's age, education, work experience and updated RFC, and the VE's testimony, the ALJ determined there were no jobs that existed in significant numbers in the national economy that Plaintiff could have performed during the period of May 24, 2016 through August 3, 2017.  (Id.)

1    Accordingly, the ALJ concluded Plaintiff was under a disability from May 24, 2016

2    through August 3, 2017.  (AR 982 (citing 20 C.F.R. § 404.1520(g)).)

3        **C.      The Period Beginning August 4, 2017**

4    However, the ALJ concluded that medical improvement occurred as of August 4, 2017,

5    and Plaintiff's disability ended on that date.  (Id. (citing 20 C.F.R. § 404.1594(b)(1)).)  As for the

6    period beginning August 4, 2017, the ALJ determined at step two that Plaintiff has had the severe

7    impairments of borderline intellectual functioning, an anxiety disorder, ADHD, agoraphobia,

8    depression, asthma, obesity, peripheral vascular disease, and a right ankle fracture, status post

9    open reduction and internal fixation.  (AR 982–83 (citing 20 C.F.R. § 404.1520(c)).)  At step

10   three, the ALJ found Plaintiff has not had an impairment or combination of impairments that

11   meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P,

12   Appendix 1.  (AR 983 (citing 20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526).)  Similar to his

13   step three analysis with respect to the time period prior to May 24, 2016, the ALJ considered

14   listings 1.18 (abnormality of a major joint in any extremity), 3.03 (asthma), and 4.12 (peripheral

15   arterial disease), but did not find any medical evidence in the record documenting such "listing-

16   level severity" of impairments.  (Id.)

17   With regard to the paragraph B criteria, the ALJ determined that Plaintiff had a "mild"

18   limitation in his ability to "understand, remember, or apply information"; a "moderate" limitation

19   in the ability to "interact with others"; he had a "moderate" limitation in the ability to

20   "concentrate, persist, or maintain pace"; and a "marked" limitation in the ability to "adapt or

21   manage oneself."  (Id.)  With respect to the moderate limitations, the ALJ noted these findings

22   were consistent with medical records showing Plaintiff routinely exhibited normal and

23   cooperative behavior with a normal affect, good insight, clear cognition, and unimpaired

24   judgment, and the medical opinion of Dr. Akins.  (Id. (citing AR 2634, 2779, 1032–44, 3063).)

25   The ALJ also considered whether the "paragraph C" criteria were satisfied, and again determined

26   that they were not.  (AR 984.)

27   Before proceeding to step four, based on his review and summary of the record pertaining

28   to the time period beginning August 4, 2017 (see AR 985–89), the ALJ determined that,

beginning August 4, 2017, Plaintiff had the RFC to perform:

> **a range of work at the light exertional level as defined in 20 CFR 404.1567(b). Specifically, he is able to lift and carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk four out of eight hours in an eight-hour workday, and he is able to stand and/or walk for an hour at a time without changing position. The claimant is unable to walk on uneven terrain. He is able to sit for eight hours total in an eight-hour workday and is able to sit for two hours at a time without a change in position. The claimant is frequently able to climb ramps and stairs, but never able to climb ladders, ropes and scaffolds. The claimant can balance on an occasional basis, and is … frequently able to crawl, crouch, kneel and stoop. The claimant is frequently able to operate foot controls with his right lower extremity, and he should not work in environments subjecting him to concentrated exposure to respiratory irritants such as gases, dust, smoke and/or fumes, or extreme cold or warm temperatures. The claimant [is] further unable to work in environments exposing him to unprotected heights. He can perform jobs of a non-complex nature requiring the performance of no more than simple, routine tasks and cannot work in environments requiring fast paced production quotas such as assembly line work. In addition, the claimant can have occasional contact with coworkers, supervisors, and the public.**

(AR 984–85 (emphasis in original).)

At step four, the ALJ found Plaintiff is unable to perform his past relevant work as a hand packager. (AR 989 (citing 20 C.F.R. § 404.1565).) At step five, the ALJ noted Plaintiff's age category, education level, and ability to transfer job skills remained the same as noted for the prior time periods, and considering Plaintiff's age, education, work experience and RFC, and the VE's testimony, the ALJ determined Plaintiff could again perform jobs existing in significant numbers in the national economy, such as: Price Marker, Garment Sorter, and Routing Clerk, as defined in the DOT. (AR 989–90 (citing 20 C.F.R. §§ 404.1560(c), 404.1566).)

Therefore, the ALJ found Plaintiff's disability ended August 4, 2017 (the date of medical improvement), and he has not become disabled again since that date. (AR 990 (citing 20 C.F.R. § 404.1594(f)(8)).)

**D.      ALJ's Conclusion**

In sum, the ALJ concluded Plaintiff was disabled from May 24, 2016 through August 3, 2017, due to his ankle fracture, and not at any other time. (Id.)

///

13

**V.**

**DISCUSSION AND ANALYSIS**

Plaintiff raises two issues in the instant appeal: (1) whether the ALJ properly evaluated the medical opinion of Plaintiff's treating physician to reach the RFC determination; and (2) whether the ALJ's credibility determination is supported by substantial evidence.  (ECF No. 14 at 19.)  The Court will address Plaintiff's arguments in turn.

    **A.**    **RFC Determination Based on Evaluation of the Medical Opinion Evidence**

Plaintiff does not challenge the ALJ's finding of disability from May 24, 2016 to August 3, 2017, related to Plaintiff's broken ankle.  Instead, Plaintiff argues the ALJ's RFC determination with respect to the time periods before and after this period of disability (pre-May 24, 2016 and post-August 3, 2017) is not supported by substantial evidence because the ALJ failed to properly weigh the medical opinions of Plaintiff's treating physician, Dr. McLain.  (Id. at 20–26.)

    1.    Relevant Medical Opinions

    **a.**    **Physical Impairments**

Drs. Arthur Lorber, M.D., Mary McLain, M.D., Sadda V. Reddy, M.D., J. Linder, M.D., S. Amon, M.D., and G. Spellman, M.D. provided opinions as to Plaintiff's physical impairments and functional capacity.

With respect to the time period prior to May 24, 2016, the ALJ gave some weight to the opinion of Dr. Lorber, and discounted and afforded little or limited weight to the opinions of Drs. McLain, Reddy, Linder, Amon, and Spellman.  (AR 972–73.)  Similarly, with respect to the time period beginning August 4, 2017, the ALJ accorded "significant weight" to Dr. Lorber's expert opinion, and discounted and afforded little or limited weight to the opinions of Drs. McLain, Reddy, Linder, Amon, and Spellman, as detailed herein.  (AR 985.)

    i.    Opinion of Treating Physician Dr. McLain

In a four-page, largely check-the-box "Dizziness Medical Source Statement" dated May 15, 2018 (AR 582–85), Dr. McLain diagnoses Plaintiff with chronic dizziness and [illegible], related to factors "unknown at this time."  (AR 582.)  The statement indicates Plaintiff reported

14

dizziness episodes four times a week, lasting less than an hour.  (Id.)  Symptoms checked include visual disturbances and mental confusion/inability to concentrate.  (AR 583.)  The form does not identify any after-effects that follow each dizziness episode, but it does indicate such unidentified after-effects last for approximately thirty minutes, and they interfere with Plaintiff's daily activities on a mild to moderate degree.  (Id.)  Dr. McLain opines Plaintiff will need more supervision at work; he cannot work at heights; he can work with power machines; he cannot operate a motor vehicle; he can take the bus alone.  (Id.)  Dr. McLain opines Plaintiff has a short attention span, memory problems, and an intellectual disability.  (AR 584.)  He is capable of low stress work.  (Id.)  The remainder of the form—which provides sections to identify the reasons for the doctor's conclusion and identify the patient's limitations—is blank, with a reference to "see other medical form" (presumably the "Physical Medical Source Statement at AR 590–94).  (AR 584–85.)

In a separate "Medical Source Statement" form questionnaire (AR 590–94) also dated May 15, 2018, Dr. McLain notes she has seen Plaintiff approximately every three months since 2011, and treated Plaintiff since November 2015 for intellectual disabilities, major depression, agoraphobia, panic disorder, chronic [illegible] of displaced fractured right tibia, ADHD, and anal leakage.  (AR 590.)  Plaintiff's prognosis is "stable."  (AR 590.)  On this form, Dr. McLain notes Plaintiff complains of leg, ankle, and back pain, panic, anxiety, depression, and chronic dizziness.  (Id.)  Plaintiff complains of ankle pain with prolonged standing, and chronic swelling in his ankle.  (Id.)  Dr. McLain notes the clinical findings and objective signs include "chronic ankle edema, decreased ROM, decreased rectal tone, slow intellectually, [and] moderate to severe asthma."  (Id.)  Dr. McLain indicates treatments include "medications which help some with anxiety/depression but [Plaintiff] has stable ankle pain and [illegible, crossed out]."  (Id.)  Dr. McLain identifies depression, anxiety, and intellectual disabilities as psychological conditions that affect Plaintiff's physical condition.  (AR 592.)  She opines the following functional limitations: Plaintiff is able to walk 5–10 city blocks without rest or severe pain; he is able to sit for more than two hours before needing to get up; he is able to stand for one hour at a time before needing to change position; he is able to sit at least six hours, and stand/walk about four hours; he

needs a job that permits shifting positions from sitting, standing, and walking; he needs to includes periods of walking around for 5–10 minutes every 90 minutes in an eight-hour day; Plaintiff does not need to take unscheduled breaks during a workday; with prolonged sitting, Plaintiff must elevate his leg 90 degrees for 30–40% of an eight-hour day; he does not require an assistive device to ambulate; Plaintiff can rarely climb stairs and ladders; he can occasionally crouch/squat; he can frequently twist and stoop (bend); Plaintiff has no reaching, handling, or fingering limitations; Plaintiff is likely to be "off task" for 15% of the workday; due to his decreased mental ability coupled with anxiety and depression, Plaintiff is capable of "low stress" work only; Plaintiff's impairments are likely to produce "good days" and "bad days"; and Plaintiff will likely be absent from work about four days per month due to his impairments.  (AR 592–94.)  Dr. McLain does not opine as to how many pounds Plaintiff can lift/carry.  (See AR 593.)

In discounting and affording "little weight" to Dr. McLain's May 15, 2018 opinions as to Plaintiff's physical impairments for the time period before May 24, 2016, the ALJ explained:

> I discount and afford little weight to the opinion[] of Dr. McLain (see Exhibits 11F-12F) for the period prior to May 24, 2016 because it is not fully consistent with the medical and other evidence from that period. For example, it is inconsistent with and does not adequately account for the claimant's asthma (Exhibits 1F, p. 3; 2F, p. 13; 4F, p. 4).  Furthermore, during the period prior to May 24, 2016, the opinion that he will be "off task" 15% of the time or absent from work four days per month is unsupported by objective evidence or clinical findings. The opinion is also inconsistent with and over- restrictive, especially in light of a chest x-ray done in February 2012 showing no evidence of acute cardiopulmonary disease (see Exhibit 1F, p. 28) and with an echocardiogram done in February of 2016 that revealed normal left ventricular diastolic filling with an estimated ejection fraction of 60% to 65% (see Exhibit 16F, pp. 4-6). The opinion is also inconsistent with the expert opinion of Dr. Lorber (hearing testimony).

(AR 972–73.)

The ALJ also discounted and afforded "little weight" to Dr. McLain's opinion for the time period beginning August 4, 2017, because:

> it is not fully consistent with the medical and other evidence from that period. For example, it is inconsistent with and does not adequately account for the claimant's asthma (Exhibits 1F, p. 3; 2F,

p. 13; 4F, p. 4). Furthermore, during the period beginning August 4, 2017, the opinion that he will be "off task" 15% of the time or absent from work four days per month is unsupported by objective evidence or clinical findings. The opinion is also inconsistent with treatment reports showing a normal gait, with normal cranial nerves, no evidence of motor weakness, normal deep tendon reflexes, and no sensory deficit (Exhibits 28F, pp. 7 -8; 29F, pp. 7-8). The opinions are also inconsistent with reports showing he exhibited full strength in the lower extremities (see Exhibit 38F, p. 9; 41F, pp. 9-10) with no pedal edema or clubbing in the extremities (see Exhibit 53F, pp. 1-2). In addition, impartial medical expert Dr. Lorber, reviewed the opinions of Dr. McLain in conjunction with the other medical evidence and did not adopt her limitations in his opinion.

(AR 986.)

       ii.    <u>Opinions of State Agency Consulting Physicians Drs. Reddy, Linder, Amon, and Spellman</u>

On September 16, 2015, at the initial level of review for Plaintiff's initial claim, Dr. Reddy opined Plaintiff has no exertional, postural, manipulative, visual, or communicative limitations, but needs to avoid concentrated exposure to fumes, odors, dusts, gases, and poorly ventilated areas. (AR 68–71). Dr. Reddy's opinion is based on records indicating Plaintiff is a younger individual who did not allege any physical limitations; his activities of daily living (ADLs), indicate he is "quite functional," in that Plaintiff is able to complete independent self-care, cut grass, do laundry, shop in the store for food, and walk two blocks at a time; Plaintiff's original complaints of right upper quadrant pain was due to cholelithiasis (his lungs were clear), the records did not reflect any obvious etiology for flank pain; Plaintiff had gall bladder surgery in June 2014; and Plaintiff's asthma is controlled with inhalers, with no ER visits or hospitalizations, and clear lungs except for one visit in April 2014, in which a wheeze was noted. (AR 70.) On February 18, 2016, on reconsideration, Dr. Linder reviewed and endorsed Dr. Reddy's opinion. (AR 85–87.)

After remand of the claim, on July 20, 2020, Dr. Amon opined Plaintiff is able to lift and carry twenty pounds occasionally and ten pounds frequently; stand and walk about six hours; and sit for more than six hours an eight-hour workday; occasionally push and/or pull with the lower right extremity; frequently balance, stoop, crouch, and climb ramps or stairs; occasionally kneel,

crawl, and climb ladders, ropes, or scaffolds; and needs to avoid concentrated expose to fumes, odors, dusts, gases and poorly ventilated areas.  (AR 1121–23.)  This decision was based on findings in the record, including consideration of Plaintiff's complaints of chronic ankle pain, back pain, and headaches, but there was no abnormal gait, and ROM is full for the ankle.  (AR 1123.)  On October 28, 2020, on reconsideration of the remanded claim, Dr. Spellman opined Plaintiff is limited to pushing and/or pulling twenty pounds with the right lower extremity; can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps or stairs; should never climb ladders, ropes or scaffolds; and needs to avoid concentrated exposure to fumes, odors, dusts, gases, and poorly ventilated areas.  (AR 1176–80, 1178–80.)

The ALJ gave only limited weight to the opinions of Drs. Reddy and Linder for the period prior to May 24, 2016, because the environmental limitations were consistent with Plaintiff's asthma impairment, but the lack of other physical limitations failed to account for Plaintiff's obesity and peripheral vascular disease and were therefore inconsistent with the record in that regard.  (AR 793.)  The ALJ gave limited weight to the opinions of Drs. Amon and Spellman because they were not fully consistent with the medical and other evidence, including Plaintiff's obesity and report of some chest pain with evidence of possible peripheral vascular disease.  (AR 973.)  The ALJ also noted Dr. Lorber's findings and opinion were based on a much larger portion of the medical record than the opinions of Drs. Amon and Spellman.  (Id. ; see also AR 986.)

The ALJ also gave only limited weight to the opinions of these doctors as they pertain to the time period beginning August 4, 2017.  (AR 986.)  Again, the ALJ found the opinions of Drs. Reddy and Linder were consistent with the medical and other evidence related to Plaintiff's asthma (Id. (citing AR 266, 310, 345)), but not Plaintiff's obesity, peripheral vascular disease, and right ankle fracture (Id. (citing AR 315)).  More importantly, these opinions were authored prior to August 4, 2017.  (Id.)  The ALJ discounted the opinions of Drs. Amon and Spellman for the same reasons as articulated with respect to the period prior to My 24, 2016.  (Id.)

      iii.     <u>Opinion and Expert Testimony of Reviewing Physician Dr. Lorber</u>

As noted in his decision, the ALJ relied heavily on the objective expert testimony of Dr.

///

Lorber.  Dr. Lorber, who reviewed nearly all of Plaintiff's medical record,[10] considered Plaintiff's age of 43 and obesity as factors upon any exertional impairments.  (AR 1021.)  Regarding the issue of pulmonary function, Dr. Lorber noted Plaintiff has asthma and is treated with inhalers and a nebulizer at home, but there is no evidence in the record of frequent visits to any medical facility for the treatment of acute asthmatic attack; he opined Plaintiff has an impairment which will reduce his RFC but that the impairment does not meet or equal listing 3.03.  (Id.)  Regarding Plaintiff's right ankle and foot, Dr. Lorber noted Plaintiff fell from a ladder, a distance of four feet, on May 24, 2016, while he was trying to clean spider webs from the corner of his house.  (Id.)  X-rays revealed Plaintiff sustained a significant fracture of the right ankle, which was treated with a spanning external fixator.  (AR 1021–22 (citing AR 1385).)  On June 10, 2016, the fixator was removed and Plaintiff underwent open reduction and internal fixation of the ankle fracture, utilizing plates and screws.  (AR 1022 (citing AR 1410).)  Dr. Lorber testified that x-rays and CAT scans showed Plaintiff had some delayed healing of the fracture but that the fracture was pretty well healed by December 17, 2018.  (Id. (citing AR 3100).)  Dr. Lorber noted Plaintiff has been ambulatory without the use of an assistive device but continues to complain of swelling about the ankle.  (Id.)  He was prescribed an elastic compression hose, but rarely if ever uses the hose to control the edema, because he finds it uncomfortable.  (Id.)  Therefore, a physician subsequently advised that Plaintiff wrap his ankle with an ace bandage in order to control the edema in his leg; Plaintiff has had venous doppler studies to rule out deep venous thrombosis, and those studies were negative.  (Id.)  Some physicians advised that he elevate his

[10] Of Plaintiff's 56 medical record exhibits, Dr. Lorber reviewed Plaintiff's exhibits 1F through 50F (AR 264–3406), inclusive of medical records from December 26, 2011 to February 6, 2021, and based his opinion on these records and Plaintiff's testimony at the hearing.  (AR 1014.)  The 18 pages of records Dr. Lorber did not review as of the date of the hearing pertain to: treatment notes dated December 17, 2018 and December 31, 2020 (AR 3425–26 (x-rays showing further healing of distal labial and fibular fractures since last x-ray)); an office visit note from December 16, 2020 (AR 3419–21 (complaints of asthma; prescribed inhaler)); a pulmonary function test on Plaintiff's asthma taken on April 2, 2021 (AR 3408–16 (Plaintiff produced wheezing)); a doctor's note dated April 2, 2021 excusing Plaintiff, "lifelong," from jury duty due to "mental medical conditions" (AR 3418); and a psychological evaluation performed on April 12, 2021 (AR 2422–24).  The Court notes the last two exhibits, which pertain to Plaintiff's mental impairments, would be irrelevant to Dr. Lorber's opinion solely regarding Plaintiff's physical impairments, as he declined to issue any opinion with respect to Plaintiff's MRFC, and instead deferred to the psychologist expert.  The other notes were addressed by the ALJ in his decision.  In addition, the Court notes that, because Plaintiff's last insured date (which is undisputed) was December 31, 2016, he was required to establish disability existed as of that date for Title II purposes.  (See AR 1035–36.)

19

leg.  (Id.)  However, Dr. Lorber noted there is no evidence in the record of any skin lesion related to venous insufficiency; he has no ulcer; he does not wear the prescribed compression hose; and the physician advised Plaintiff could just wear an ace bandage.  (AR 1025.)  Dr. Lorber therefore opined the ace bandage would be sufficient to control the issue of edema, and permit Plaintiff to function at the RFC level he described; thus, Dr. Lorber opined that further elevation of the leg during the work day, after one year of fracture healing, was not necessary.[11]  (AR 1025, 1028–29.)

Dr. Lorber also noted Plaintiff has a history of low back pain for many years.  (AR 1022.)  Plaintiff alleges he injured both his ankle and his back during his ladder fall, but x-rays of the lower back revealed only minimal degenerative changes.  (AR 1022–23 (citing AR 395).)  Dr. Lorber noted the record does not include significant evidence of focal neurologic deficits required to meet a listing, and opined Plaintiff has minimal impairment related through his lumbar.  (AR 1023.)

Based on his review of the record, Dr. Lorber opined Plaintiff did meet a listing for one year, following the acute ankle fracture.  (Id.)  However, subsequent to that time, Dr. Lorber opined Plaintiff can lift 20 pounds occasionally and 10 pounds frequently; he can stand and walk up to four hours per day, not more than one hour at a time; he can sit for a total of eight hours per day, not more than two hours at a time; when changing position from standing or walking to sitting, it is not necessary to take a break from work; Plaintiff cannot work at unprotected heights; he cannot climb ladders, scaffolds, or ropes; he cannot walk on uneven surfaces; he cannot balance (such as on a balance beam); he has enough balancing ability for walking; he may climb stairs frequently; he may operate foot pedals with the involved foot only occasionally; there are no restrictions regarding the use of the foot pedal with his left lower extremity; he may kneel and

---

[11] In addition, Dr. Lorber noted "someone is also advising [Plaintiff to take] short term addictive narcotics [for pain], which is, in my judgment, improper.  The … purpose of—I know no expert in pain management [who] recommends chronic use of short acting narcotics."  (AR 1029–30.)  But Dr. Lorber also described the pain medications as being taken to a "minimal degree or amount[], which [he believed was indicative] of [Plaintiff's] ability to function at the level" Dr. Lorber advised.  (AR 1026–27.)  Further, in stating that Plaintiff's chronic use of addictive narcotics, such as hydrocodone 10 milligrams twice a day, is improper treatment, Dr. Lorber recommended that those medications be discontinued in favor of other, nonaddictive pain medications "that can be used to treat the pain level which [Plaintiff] apparently has."  (AR 1030.)

crawl without exception; he may stoop and crouch frequently; he should avoid exposure to concentrated fumes, extreme cold and extreme heat; and he requires no other exertional, environmental, positional, or manipulative restrictions.  (AR 1023–24.)

The ALJ gave "some weight"  to Dr. Lorber's opinion for the period prior to May 24, 2016, as generally consistent with the evidence from that period, such as the evidence of Plaintiff's asthma and obesity.  (AR 972.)  The ALJ also found Dr. Lorber's status as an impartial medical expert, the fact that he performed a comprehensive review of the evidence, and Dr. Lorber's specific citations to the medical evidence of record in support of his opinion enhanced the persuasiveness of his opinion.  (Id.)

The ALJ gave "significant weight" to Dr. Lorber's opinion as it pertains to the period beginning August 4, 2017, because it is generally consistent with Plaintiff's condition as evidenced in the record—particularly Plaintiff's right ankle fracture, for which Plaintiff's pain reports fluctuated, but treatment notes show a normal gait, with normal cranial nerves, no evidence of motor weakness, normal deep tendon reflexes, and no sensory deficit.  (AR 985–86 (citing AR 2696–97, 2733–34).)

**b.     Mental Impairments**

Drs. Faren R. Akins, Ph.D., Steven C. Swanson, Ph.D., H. Amado, M.D., Joshua D. Schwartz, Ph.D., Uwe Jacobs, Ph.D., Susan Wallace, M.D., Adrianne Gallucci, Psy.D., and McLain provided opinions as to Plaintiff's mental impairments and functional capacity.  The ALJ also construed Plaintiff's various Global Assessment of Functioning ("GAF") ratings as opinion evidence as defined under 20 C.F.R. § 404.1527(a)(2), and weighted them accordingly.

With respect to the time period prior to May 24, 2016, the ALJ gave "significant weight" to Dr. Akins's opinion and "some weight" to the opinions of Drs. Swanson, Amado, Schwartz, and Jacobs.  (AR 974–75.)  The ALJ discounted and afforded "little weight" to the opinions of Drs. Wallace, McLain, and Gallucci.  (AR 976.)  He afforded "limited weight" to the GAF ratings.  (Id.)  With respect to the time period beginning August 4, 2017, the ALJ again accorded "significant weight" to the expert opinion of Dr. Akins (AR 987); "some weight" to the opinions of Drs. Swanson, Amado, Schwartz, and Jacobs (AR 987–88); "limited weight" to Plaintiff's

GAF ratings (AR 988); and the ALJ discounted and afforded "little weight" to the opinions of Drs. Wallace, McLain, and Gallucci (AR 987–88), as detailed herein.

### i.     Opinion of Treating Physician Dr. McLain

On May 15, 2018, Dr. McLain completed a "Mental Impairment Questionnaire" in which she noted Plaintiff has treated with her clinic since 2011, and been seen by Dr. McLain approximately every three months since November 2015.  (AR 586.)  Dr. McLain diagnosed Plaintiff with depression, anxiety, and "not completely diagnosed" intellectual disabilities.  (Id.) She treated Plaintiff's anxiety and depression with medications; this "moderately controls [Plaintiff's] struggles." (Id.)  Dr. McLain concludes Plaintiff has developmental disabilities that interfere with his ability to function in a normal environment; and his prognosis is "stable?"  (Id.) Dr. McLain checks the following boxes indicating Plaintiff's signs and symptoms: appetite disturbance with weight change; decreased energy; feelings of guilt or worthlessness; impairment in in impulse control; generalized persistent anxiety; difficulty thinking or concentrating; apprehensive expectation; recurrent obsessions or compulsions which are a source of marked distress; persistent irrational fear of a specific object, activity, or situation which result in a compelling desire to avoid the dreaded object, activity or situation; and loosening of associations and/or illogical thinking.  (AR 587.)  Dr. McLain notes Plaintiff has a low IQ or reduced intellectual functioning, but in support of this finding only states "I have been trying to get them tested since 2015 without result" and it is "unknown" whether Plaintiff's psychiatric condition exacerbates his experience of pain or any other physical symptom. (AR 588.)  Dr. McLain opines Plaintiff has "none-mild" restriction of activities of daily living; "moderate" difficulties in maintaining social functioning; "moderate" difficulties in maintaining concentration, persistence or pace; and one or two episodes of decompensation within a 12 month period, each of at least two weeks duration.  (Id.)  There are spaces on the form in which the doctor has the option to provide dates of the episodes of decompensation, but Dr. McLain does not provide any further information to support her opinion here.  (See id.)  In addition, Dr. McLain checks a box indicating that Plaintiff has a "[m]edically documented history of chronic organic mental, schizophrenic, etc., of affective disorder of at least 2 years' duration that has caused more than a

minimal limitation of ability to do any basic work activity, with symptoms or signs currently attenuated by medication or psychosocial support, and … [a] residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate."  (AR 588–89.) Finally, Dr. McLain opines Plaintiff's impairments would cause him to be absent from work about four days per month.  (AR 589.)

The ALJ discounted Dr. McLain's May 15, 2018 Dr. McLain's mental impairment questionnaire opinion for the period prior to May 24, 2016, because:

> it is not fully consistent with the evidence from that period.  For example, it is inconsistent with and over-restrictive, especially in light of the generally unremarkable reviews of the psychiatric system (see Exhibit 4F, pp. 12, 14) and a September of 2015 report showing he demonstrated normal insight and communication (see Exhibit 5F, p. 14).  The opinion is also inconsistent with the findings and expert opinion of Dr. Akins (hearing testimony).

(AR 975.)

ii.    Letter Opinion from Treating Physician Dr. Wallace

In a one-paragraph letter dated April 2, 2021 and titled "Inability to be a Juror for medical reasons," Dr. Wallace states, "I am seeing the [Plaintiff] in this clinic.  Given the mental medical conditions patient [sic] would not be able to do duty as a juror and is excused lifelong.  This patient currently is incapable of exercising a balanced judgment or detailed reasoning process needed for Jury Duty."  (AR 3418.)  No other detail or information is provided in the letter.

The ALJ discounted and afforded little weight to Dr. Wallace's letter opinion for the period prior to May 24, 2016, because it is inconsistent with the medical and other evidence, including the findings and expert opinion of Dr. Akins.  (AR 974.)  In addition, the ALJ found Dr. Wallace's opinion is inconsistent with a report showing unremarkable psychomotor behavior with an intact memory, and a logical thought process and unremarkable thought content.  (AR 975 (citing AR 330).)  The ALJ also found the letter provides only a commentary on Plaintiff's purported limitations regarding ability to reason and process information, but does not provide specific guidance as to the degree to which impairments impact functional abilities relating to a

capacity to work.  (Id.)

The ALJ discounted the letter opinion for the same reasons with respect to the period beginning August 4, 2017, noting again that the opinion is inconsistent with the medical record from this period, such as a mental status examination showing normal and cooperative behavior, logical, relevant, and coherent thought process, unimpaired judgment, and clear cognition.  (AR 987 (citing AR 3234).)

iii.    Opinions of Consulting Psychological Physician Dr. Swanson, and Consulting State Agency Physicians Drs. Amado, Schwartz, Jacobs, and Gallucci

Dr. Swanson performed a consultative psychological assessment on September 8, 2015, in which he administered a clinical interview, the Wechsler Adult Intelligence Scale-Fourth Edition ("WAIS-IV"), the Wechsler Memory Scale-Fourth Edition ("WMS-IV"), and the Trail Making Test ("TMT").  (AR 335–41, 341.)

During the interview, Plaintiff indicated he was a slow learner and attended special education classes; he graduated from high school but did not attend college.  (AR 337.)  Plaintiff moved from Arizona to Fresno, California to live with his now four-year-old daughter and girlfriend, the mother of his child.  (Id.)  He was previously employed in warehouse work for thirteen years in Arizona but quit when he moved.  (Id.)  Plaintiff reported difficulty in finding a new job in California.  (Id.)  He has not been in jail or a psychiatric hospital.  (Id.)  He only uses an inhaler as needed for asthma.  (Id.)  He enjoys playing golf.  (Id.)  His girlfriend described Plaintiff as "easily overwhelmed" and "forgetful."  (Id.)  Dr. Swanson noted Plaintiff appeared appropriately groomed; his attitude was friendly and cooperative; his level of eye contact was within normal limits; he ambulated independently, unaccompanied; nothing atypical was observed in Plaintiff's gait or postural presentation; he displayed an average amount of motor movement with no marked idiosyncrasies.  (AR 338.)  Plaintiff's speech was unremarkable, with no noted speech peculiarities; he exhibits a full range of affect; mood was euthymic; and form and content were within normal limits.  (Id.)  Plaintiff reported feeling "nervous" and indicated he felt "okay … tired," most days.  (Id.)  Dr. Swanson found no evidence of delusional material, disorder of perception, or indication of psychosis; no suicidal or homicidal ideation was elicited;

and vegetative signs of depression were mostly absent.  (Id.)  Dr. Swanson noted Plaintiff's short-term, recent and remote memories were within normal limits; he displayed adequate abstraction ability and concentration for performing simple mathematical calculations; judgment and insight were deemed intact; Plaintiff's general fund of knowledge fell within normal limits; and Plaintiff maintained satisfactory attention and concentration.  (Id.)  WAIS-IV testing yielded Full Scale IQ ("FSIQ") score of 80, which falls within the borderline intellectual functioning range of intellectual ability; no significant difference between the verbal comprehension and perceptual reasoning results was noted.  (AR 339.)  Dr. Swanson concluded from the test results that Plaintiff can be expected to perform at a "somewhat lower" academic level than same-aged peers.  (AR 339–40.)  The WMS-IV test scores were consistent with his intelligence test scores and did not reveal any relative weakness in memory functioning.  (AR 340.)  Plaintiff's TMT test results indicate his visual, conceptual, and visuomotor tracking skills fall within normal limits based upon his level of intellectual functioning.  (Id.)

At bottom, Dr. Swanson concluded Plaintiff's intellectual functioning test results fell at the upper end of the borderline range, but his mental and emotional functioning appears to fall generally within normal limits, and there is no indication of any serious psychopathological disturbance.  (AR 340–41.)  Dr. Swanson diagnosed Plaintiff with borderline intellectual functioning and asthma.  (AR 340.)  He opined Plaintiff is able to maintain concentration and appropriately relate to others in a job setting; that Plaintiff would be able to handle funds in his own best interests; that Plaintiff is able to understand, carry out, and remember simple instructions; and he is able to respond appropriately to usual work situations, such as attendance and safety.  (AR 341.)  Dr. Swanson further opined that changes in routine would not be problematic for Plaintiff; there do not appear to be substantial restrictions in daily activities; and Plaintiff does not have difficulty in maintaining social relationships.

Dr. Amado performed a consultative assessment of Plaintiff on September 15, 2015.  (AR 70–72.)  Based on his review of the record through September 2015, Dr. Amado concluded Plaintiff has a moderate limitation in ability to understand and remember detailed instructions, but is not significantly limited in ability to remember locations and work-like procedures or to

remember very short and simple instructions; he is moderately limited in ability to carry out detailed instructions, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, sustain an ordinary routine without special supervision, work in coordination with others without being distracted by them and complete a normal workday without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, but is not significantly limited in ability to carry out short and simple instructions or make simple work-related decisions; that he does not have any significant limitations regarding social interactions; that he is moderately limited in ability to respond appropriately to changes in the work setting, but not significantly limited regarding normal hazards, travelling to unfamiliar places, or setting realistic goals and making plans independently of others.  (AR 71–72.)  Based on these findings, Dr. Amado opined that Plaintiff is able to learn, retain, and implement at least simple one-to-two step instructions that are clearly explained with adequate persistence and pace in order to complete usual work schedules; Plaintiff retains adequate social and communicative skills to get along with other people, including the general public, if needed; and Plaintiff is able to adapt to routine changes in the work setting.  (Id.)

On reconsideration, state agency consultant Dr. Gallucci reviewed Plaintiff's updated allegations through February 25, 2016, that he has trouble focusing and remembering things, experiences racing thoughts and becomes frustrated/anxious easily, is afraid of crowds, needs reminders to care for personal hygiene, only completes basic household tasks with reminders/encouragement, is impulsive with money, has a short attention span and difficultly with following directions, failed his driver's test so doesn't have a license and depends on others for rides, and that he enjoys playing gold and watching TV or spending time with his friends.  Dr. Gallucci also revied Plaintiff's updated medical records, and concluded Plaintiff has shown up somewhat disheveled at office visits, but has no severe impairment in mood or affect; testing shows no severe impairment in memory; and Dr. Gallucci appears to express skepticism at Plaintiff's allegation that he is unable to work in California and care for himself now, whereas he was working and presumably taking care of himself prior to quitting his job in Arizona and

relocating to be near his child, stating the allegation does not appear supported in the record.  (AR 83.)  Dr. Gallucci opined that Plaintiff does not have a severe mental impairment.  (AR 81–84.)

On remand, state agency consultant Dr. Schwartz reviewed the record through July 3, 2020, in which Plaintiff alleged impairments including agoraphobia, depression, ADHD, learning disability, mood swings, arthritis for ankle, ankle swelling, chronic pain, headaches, and lower back pain.  (AR 1108–20.)  Dr. Schwartz concluded Plaintiff has moderate limitations in the ability to understand, remember, or apply information and to concentrate, persist, or maintain pace; he has mild limitations in the ability to interact with others, and to adapt or manage himself.  (AR 1119–20.)  He based this on findings that Plaintiff's anxiety and depression are well-controlled with medication, and Plaintiff's prior testing results indicate he is in the borderline to low average range of intelligence.  (AR 1120.)  Dr. Schwartz opined Plaintiff is able to perform simple tasks.  (AR 1120–25.)

On November 9, 2020, at the reconsideration level, state agency consultant Dr. Jacobs endorsed Dr. Schwartz's opinion.  (AR 1173–75, 1179–82.)

With respect to the period of time prior to May 24, 2016, the ALJ afforded "some weight" to the opinions of Drs. Swanson, Amado, Schwartz, and Jacobs because they are generally consistent with the Dr. Akins's findings and expert opinion, and with the generally unremarkable review of the psychiatric system.  (AR 976 (citing AR 353, 355).)  The ALJ also found these opinions are generally consistent with and supported by Dr. Swanson's evaluation findings (Id. (citing AR 334–41)) and a September 2015 report showing Plaintiff demonstrated normal insight and communication (Id. (citing AR 390)).  The ALJ gave "little weight" to Dr. Gallucci's opinion as inconsistent with the record, because evidence received at the hearing level, including the expert opinion of Dr. Akins, supports the existence of severe mental impairments, thus justifying the limitations the ALJ included in the RFC determination.  (Id.)

Regarding the time period beginning August 4, 2017, the ALJ again afforded "some weight" to these opinions, because they are "generally consistent" with the record from this time period, such as: the findings and opinion of Dr. Akins (AR 988 (citing AR 1032–44)); each other's opinions and findings; a review of the psychiatric system, showing Plaintiff was oriented

times four with an appropriate mood and affect, normal insight and normal judgment; a September 2020 mental status examination showing normal and cooperative behavior, logical, relevant, and coherent though process, unimpaired judgment, and clear cognition (Id. (citing AR 3234)).   The ALJ again gave "little weight" to Dr. Gallucci's opinion, for the same reasons articulated with respect to the prior time period.  (AR 988.)

        iv.    Plaintiff's Global Assessment of Functioning (GAF) Ratings

According to the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, 4th Edition (1994) ("DSM-IV"), the GAF scale is a numerical continuum that rates overall psychological functioning on a scale of 0 to 100 and is a tool for "reporting the clinician's judgment of the individual's overall level of functioning."   A rating of 21 to 30 indicates behavior that is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment; a rating of 31 to 40 indicates some impairment in reality testing or communication or major impairment in several areas; a rating of 41 to 50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning; a rating of 51 to 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning; and a rating of 61 to 70 indicates only mild symptoms or some difficulty in social, occupational, or school functioning.

Plaintiff was assessed GAF ratings of 41–50 on September 24, 2019 (AR 2775, 2832, 3234, 3234)[12]; 51–60 on March 17, 2020, May 26, 2020, June 25, 2019, and January 5, 2021 (AR 2771, 2825, 2828, 2836, 3284, 3284); a rating of 50 on February 18, 2016 (AR 873, 1826); ratings of 52 (July 13, 2016), 55 (January 21, 2016, and March 9, 2016), 58 (February 1, 2017), and 60 (January 15, 2014, May 4, 2016, and April 19, 2017) (AR 627, 692, 778, 786, 857, 1834, 1856, 2530); and a rating of 64 on September 12, 2015 (AR 340).

The ALJ accorded "only limited weight" to Plaintiff's GAF ratings with respect to both time periods, on the basis that they "provide only a 'snapshot' of functioning at the time of the

_____

[12] Though these test results appear in multiple exhibits, the Court notes the treatment notes here, and in many of Plaintiff's medical records appear to be duplicate copies.

1    rating and are not indicative of functioning over an extended period" of time."[13]  (AR 976, 988.)

2              v.       Opinion and Expert Testimony of Reviewing Physician Dr. Akins

3         Dr. Akins reviewed Plaintiff's record through December 31, 2016, as this was the

4    undisputed date last insured for Plaintiff, and considered the identified impairments of ADHD,

5    mood disorder, anxiety disorder, and agoraphobia, plus a diagnosis in the record of mental

6    retardation.  (AR 1636, 1040.)  Dr. Akins flatly rejected the diagnosis of mental retardation,

7    noting Plaintiff's September 2015 FSIQ test result was 80, and all of the scores on the subscales

8    were in the 80's, and "there's no way you can get an interpretation of intellectual disability from

9    that score."  (AR 1036.)  Dr. Akins also expressed concern that a consultant would reach the

10   conclusion that Plaintiff suffered from borderline intellectual functioning based on this score,

11   which is in the low average range, while simultaneously finding there was no psychiatric

12   diagnosis.  (AR 1036–37, 1039.)  Dr. Akins noted there was some support in the record for

13   Plaintiff's allegation of ADHD, as Plaintiff reported some difficulties with concentration,

14   persistence, and pace, and distractibility, but that the impairment appeared to be in the mild to

15   moderate range, at most.  (AR 1037–38.)  Dr. Akins also noted there was some support for

16   Plaintiff's claims of agoraphobia or social anxiety.  (AR 1038.)  Dr. Akins explained the reported

17   symptoms—the focus problem, decreased energy, decreased impulse control—would skew

18   towards someone who has difficulties modulating their emotions and their behavior, and has

19   difficulties in managing their stress.  (AR 1039–40.)  Noting Plaintiff's testing results on the trails

---

[13] The Court notes that, for purposes of Social Security disability benefits, GAF scores are not dispositive of whether a claimant is disabled or functionally impaired.  See, e.g., Garcia v. Astrue, 10-cv-0259 GGH, 2011 WL 4479843, at *5 (E.D. Cal. Sept. 26, 2011).  GAF scores have also been deemed unreliable, and it was "recommended that the GAF be dropped from DSM-5 for several reasons, including its conceptual lack of clarity ... and questionable psychometrics in routine practice."  See Am. Psychiatric Ass'n, Diagnostic and Stat. Manual of Mental Disorders DSM-5 16 (5th ed. 2013).  In an effort to clarify the appropriate reliance on GAF scores in adjudicating disability claims, the Social Security Administration released an Administrative Memorandum AM-13066 (the "AM"), effective date July 22, 2013, that "provides guidance to all State and Federal adjudicators (including administrative law judges) on how to consider Global Assessment Functioning (GAF) ratings when assessing disability claims involving mental disorders."  The AM emphasizes that "GAF ratings are not standardized," and that the "GAF is neither standardized nor based on normative data ....  This limits direct comparability of GAF scores assigned by different evaluators."  See also Macias v. Colvin, No. 1:15-cv-00107-SKO, 2016 WL 1224067, at *8 (E.D. Cal. Mar. 29, 2016) (affirming ALJ's rejection of GAF scores as "only a snapshot of a particular grouping of symptoms presented that day" and finding scores had little probative value where no provider explained the basis for the score assigned or the particular symptoms upon which the score was predicated, as "[t]he GAF scale anchors are very general and there can be a significant variation in how clinicians rate a GAF … Interpreting the GAF rating requires knowing what the clinician was focusing on when assigning the overall rating.") (citations omitted).

test—which is a test of both simple as well as complex problem solving—Dr. Akins opined Plaintiff would not have problem completing simple, repetitive work tasks that was not production quota work. (AR 1038–39.) Dr. Akins opined Plaintiff has a moderate impairment in the ability to interact with others socially, which would be adequately addressed with a limitation to occasional interaction. (AR 1040.) Finally, Dr. Akins testified he did not find that Plaintiff's mental impairments were secondary to pain or secondary to another medical condition. (AR 1041.) He declined to opine that Plaintiff would be "off-task" for any period of time due to his impairments, instead opining only that Plaintiff's ability to focus and concentrate on a consistent basis was a mild to moderate impairment. (AR 1042–43.)

The ALJ gave "significant weight" to Dr. Akins's opinion for the period prior to May 24, 2016, because it is generally consistent with and adequately accounts for Plaintiff's mental impairments during that period, especially in light of a report showing unremarkable thought content. (AR 974 (citing AR 330, 1033–44).)

Similarly, the ALJ gave "significant weight" to Dr. Akins's opinion for the period beginning August 4, 2017, because it was consistent with the medical records showing Plaintiff exhibited normal and cooperative behavior with a normal affect, good insight, clear cognition, and unimpaired judgment. (AR 987 (citing AR 2634, 2779, 3063).) In addition, the ALJ noted Dr. Akins also provided support for his opinion with references to the record and it is based on his comprehensive review of the medical evidence. (AR 974; see also AR 987.)

2.    Legal Standard

The RFC is an assessment of the sustained, work-related physical and mental activities the claimant can still do on a regular and continuing basis despite his limitations. 20 C.F.R. §§ 404.1520(e), 404.1545(a), 416.945(a); see also Valencia v. Heckler, 751 F.2d 1082, 1085 (9th Cir. 1985) (RFC reflects current "physical and mental capabilities"); SSR 96-8p, at *2. Thus, it represents the maximum amount of work the claimant is able to perform based on all the relevant evidence in the record. See id.; see also 20 C.F.R. § 416.945(a)(3) (RFC determination must be "based on all of the relevant medical and other evidence."). As previously noted, the RFC is not a medical opinion, but a legal decision that is expressly reserved for the Commissioner. See 20

C.F.R. §§ 404.1527(d)(2), 404.1546(c); Vertigan, 260 F.3d at 1049 ("It is clear that it is the responsibility of the ALJ, not the claimant's physician, to determine residual functional capacity.") (citing 20 C.F.R. § 404.1545).  And where "the record contains conflicting medical evidence, the ALJ is charged with determining credibility and resolving the conflict." Benton v. Barnhart, 331 F.3d 1030, 1040 (9th Cir. 2003); Batson, 359 F.3d at 1195.

In reviewing whether an ALJ committed error in determining the RFC, the relevant inquiry is whether the medical evidence supports the ALJ's finding. Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1173–74 (9th Cir. 2008) (holding the RFC assessment adequately captures restrictions if it is consistent with the concrete limitations in the medical opinions); see also Schneider v. Comm'r, 433 Fed. Appx. 507, 509 (9th Cir. 2011) (ALJ's failure to address claimant's migraines was harmless because medical record did not support finding that migraines would affect claimant's functioning at work).  Accordingly, "[t]he ALJ's RFC determination need not precisely reflect any particular medical provider's assessment." Althoff-Gromer v. Comm'r of Soc. Sec., No. 2:18-cv-00082-KJN, 2019 WL 1316710, at *13 (E.D. Cal. Mar. 22, 2019) (citing Turner v. Comm'r of Soc. Sec., 613 F.3d 1217, 1222–23 (9th Cir. 2010)); see also Chavez v. Colvin, 654 Fed. App'x 374, 375 (10th Cir. 2016).  This is because it is within the ALJ's province to synthesize the medical evidence. See Lingenfelter v. Astrue, 504 F.3d 1028, 1042 (9th Cir. 2007).

Nevertheless, when evaluating claims filed before March 27, 2017, as here,[14] the ALJ must explain the weight he gives to all medical source opinions. See 20 C.F.R. § 404.1527(c). There are three types of physicians: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant [but who review the claimant's file] (nonexamining [or reviewing] physicians)." Holohan v. Massanari, 246 F.3d 1195, 1201–02 (9th Cir. 2001) (citations omitted).

---

[14] Because Plaintiff filed his disability claim on June 4, 2015, the ALJ was required to evaluate opinion evidence pursuant to 20 C.F.R. § 404.1527, which applies to all claims filed prior to March 27, 2017.  This standard appears undisputed: the ALJ notes in his decision that he was directed by the Appeals Council, on remand, to apply the prior rules to the instant matter (AR 963), and Defendant asserts arguments in support of the ALJ's decision pursuant to the old statute, 20 C.F.R. § 404.1527 (see ECF No. 16 at 15).

Generally, a treating physician's opinion carries more weight than an examining physician's opinion, and an examining physician's opinion carries more weight than a reviewing physician's opinion. Id. Indeed, the regulations provide that, "when a treating source's medical opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the record]," it must be given controlling weight. 20 C.F.R. § 404.1527(c)(2).

The regulations provide an ALJ may only discount the opinion of a treating physician if he provides "good reasons" based on the length of the treatment relationship and the frequency of examination and the nature and extent of the treatment relationship, as well as the factors of supportability, consistency, specialization, and any "other factors" that tend to support or contradict the medical opinion. 20 C.F.R. §§ 404.1527(c)(2)(i)–(ii), 404.1527(c)(3)–(6).

The Ninth Circuit provides that, if a treating or examining physician's opinion is uncontradicted, the ALJ may reject it only by offering "clear and convincing reasons that are supported by substantial evidence." Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005). Conversely, "[i]f a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." Id. (citing Lester v. Chater, 81 F.3d 821, 830–31 (9th Cir. 1995)). Similarly, where a treating or examining doctor's opinion is contradicted by medical evidence, the ALJ may only reject it by providing specific and legitimate reasons supported by substantial evidence in the record. See Andrews, 53 F.3d at 1041. The ALJ can satisfy the "specific and legitimate" burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings. Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008) (citing Magallanes v. Brown, 881 F.2d 747, 751 (9th Cir. 1989)). In addition, a non-examining opinion may constitute substantial evidence if it is consistent with other independent evidence in the record, and the ALJ is to resolve the conflict. See Thomas, 278 F.3d at 957; Orn, 495 F.3d at 632–33; Andrews, 53 F.3d at 1041. Finally, "the ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is

brief, conclusory and inadequately supported by clinical findings."  Bray v. Comm'r Soc. Sec.

Admin, 554 F.3d 1219, 1228 (9th Cir. 2009) (quotation and citation omitted); Thomas, 278 F.3d

at 957.

    3.   The RFC Determination is Supported by Substantial Evidence

    As noted, the ALJ reached the following RFC determination as to Plaintiff's mental and

physical impairments for the periods prior to Plaintiff's ankle fracture (May 24, 2016), and the

time period after which the fracture was deemed healed (beginning August 4, 2017):

> **a range of work at the light exertional level as defined in 20
> CFR 404.1567(b).  Specifically, he was able to lift and carry 20
> pounds occasionally and 10 pounds frequently, stand and/or
> walk four out of eight hours in an eight-hour workday, and was
> able to stand and/or walk for an hour at a time without
> changing position. The claimant was unable to walk on uneven
> terrain. He was able to sit for eight hours total in an eight-hour
> workday and was able to sit for two hours at a time without a
> change in position. The claimant was frequently able to climb
> ramps and stairs, but never able to climb ladders, ropes and
> scaffolds. The claimant could balance on an occasional basis,
> and was able to frequently able to crawl, crouch, kneel and
> stoop. The claimant was frequently able to operate foot controls
> with his right lower extremity, and he should not have worked
> in environments subjecting him to concentrated exposure to
> respiratory irritants such as gases, dust, smoke and/or fumes,
> or extreme cold or warm temperatures. The claimant was
> further able to work in environments exposing him to
> unprotected heights. He could perform jobs of a non-complex
> nature requiring the performance of no more than simple,
> routine tasks and could not work in environments requiring
> fast paced production quotas such as assembly line work.  In
> addition, the claimant could have occasional contact with
> coworkers, supervisors, and the public.**

(AR 970–71.)  For the time period during which the ALJ determined Plaintiff was disabled due to

his ankle fracture (May 24, 2016—August 3, 2017), the ALJ added the following limitation to the

above RFC determination: "**he would be off task from work related duties and assignments

for 15% of the time during an eight-hour workday.**"  (AR 979–80.)  The Court finds the

ALJ's RFC determination is supported by the record.  Stubbs-Danielson, 539 F.3d at 1173–74.

    The physical RFC was based on an extensive review and summary of the record

pertaining to the time period prior to May 24, 2016 (see AR 970–77), in which the ALJ

acknowledged Plaintiff reported some wheezing and shortness of breath (AR 971 (citing AR 268,

33

321, 389)); physicians diagnosed Plaintiff with asthma (id. (citing AR 266, 310, 345)); Plaintiff reported having asthma attacks, especially when engaged in physical activity (id. (citing AR 225)); and Plaintiff takes medication and uses an inhaler for his respiratory issues (id. (citing AR 252)); but also noted chest x-rays revealed no acute findings or interval change (id. (citing AR 289–90, 2135)); an August 2013 x-ray of the left ribs shows a grossly clear left lung (id. (citing AR 286, 2010)).   The ALJ also considered Plaintiff's obesity (id. (citing AR 299, 309)) and complaints of some chest pain suggesting possible peripheral vascular disease (id. (citing AR 270)); but noted a February 2012 x-ray showed no evidence of acute cardiopulmonary disease (id. (citing AR 291)) and a February 2016 echocardiogram revealed normal left ventricular diastolic filling with an estimated ejection fraction of 60% to 65% (id. (citing AR 1381–83)).

The additional restriction added to the RFC for the time period of May 24, 2016—August 3, 2017 was based on medical records showing Plaintiff suffered a displaced pilon fractur of the tibia (right ankle) with shattering along the lateral aspect of the tibial metaphysis on May 24, 2016, after falling from a ladder.   (AR 980 (citing AR 624, 801, 1389, 1396).)   Plaintiff underwent multi-plane external fixation on the fracture on May 25, 2016, and in June 2016, he underwent open reduction and internal fixation of the pilon with fixation of the tibia and fibula. (Id. (citing AR 1385–88, 1403–05, 1410–12).)   Thereafter, the ALJ noted Plaintiff experienced continued swelling and lack of full functional ability through November 2016, continued joint pain and swelling in February 2017, and some post-traumatic arthritis of the ankle joint in May 2017.   (AR 707, 715, 718, 980 (citing AR 525, 931, 1513, 1516–18, 1660, 2369–71, 3042).)   In particular, the ALJ found Dr. McClain's "off task" limitation was supported in the record during this period, as it pertained to Plaintiff's pain and recovery from the right ankle fracture.   (AR 981.)   Further, the ALJ determined that Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms, and that Plaintiff's symptom allegations were generally consistent with the evidence during the period from June 14, 2011 through August 3, 2017.   (Id.)

However, this additional restriction was removed as to the RFC for the period starting August 4, 2017, based on the ALJ's conclusion that medical improvement had occurred, and

Plaintiff was no longer disabled.  (AR 982.)  The ALJ reached this finding based on treatment notes in the record from this time period noting that, while Plaintiff continued to report some issues and pain with his ankle, he was ambulatory, experiencing pain only when walking or playing golf, and his pain readings fluctuate.  Further, the ALJ noted exams yielded findings of full strength in the ankles.  (Id. (citing AR 595–924, 3264).)  And the ALJ determined the medical improvement is related to the ability to work because there has been an increase in Plaintiff's RFC.  (Id. (citing 20 C.F.R. § 404.1594(b)(4)(i)).)  Finally, the Court notes the ALJ weighed the medical opinions for each time period, as detailed *supra*, and cited to these opinions in support of the physical RFC as well.

The mental RFC was also based on the ALJ's review of the record, including consideration of Plaintiff's allegations of anxiousness, excessive worrying, sadness, racing mind, and being a slow learner (AR 973–74 (citing AR 335–38, 464, 581)), and clinicians' diagnoses of anxiety (AR 974 (citing AR 315, 381, 558, 581, 1953)), depression (id. (citing AR 1549–1984)), and agoraphobia (id. (AR 381))—for which Plaintiff took medications (id. (citing AR 252))—as well as ADHD (id. (citing AR 343, 381)) and borderline intellectual functioning (id. (citing AR 340)).  As to the period prior to May 24, 2016, the ALJ considered examinations of the psychiatric system revealing an appropriate mood and affect but distracted attention (id. (citing AR 310, 319, 330)), results from the Conners' Continuous Performance Test II indicating poor CPT performance with potential attention problems (id. (citing AR 446–62, 559–74)), intellectual testing revealing functioning in the borderline range of intellectual ability (id. (citing AR 334–41, 2606–20)), a January 2014 mental status examination showing an anxious mood with below average intellect, but also unremarkable psychomotor behavior, intact memory, logical thought process, and unremarkable thought content (id. (citing AR 330)), and subsequent psychiatric system reviews that yielded positive findings of anxiety, worry, and panic, but were otherwise unremarkable, or demonstrated normal insight and communication (id. (citing AR 353, 355, 390)).

As to the period from May 24, 2016 through August 3, 2017, the ALJ noted Plaintiff continued to receive treatment for a major depressive disorder and agoraphobia with a panic

disorder.  (AR 980 (citing AR 664, 786, 856).)  The ALJ noted that, while Plaintiff continues to have ADHD during this period, reviews of the psychiatric system during this time period show Plaintiff was oriented times four with an appropriate mood and affect and normal insight and judgment.  (Id. (citing AR 751, 765).)  Thus, the ALJ's findings with respect to the severity of Plaintiff's mental impairments during this period—despite the finding of disability with respect to Plaintiff's physical limitations—remained substantially the same as before, so as to justify the same mental RFC limitations as previously identified.  The same may be said of the ALJ's mental RFC findings for the period beginning August 4, 2017.  Again, the ALJ noted Plaintiff's continuing impairments of depression, anxiety and agoraphobia, and he again noted the psychiatric system reviews in the record documenting Plaintiff was oriented times four with an appropriate mood and affect, normal insight and normal judgment.  (AR 986 (citing AR 616, 2861).)  In addition, the ALJ noted Plaintiff continued to have "mild" intellectual disabilities, but his anxiety disorder and major depressive disorder were fairly controlled (with medications) and Plaintiff was reportedly doing reasonably well, and his physical therapy reports routinely showed his mental status and cognitive function did not appear impaired.  (AR 986–87 (citing AR 471, 480, 1551, 2422, 2493).)  Importantly, with respect to Plaintiff's mental impairments, the Court notes the ALJ reached the same findings during all three time periods as to the paragraph B criteria, and the degree to which Plaintiff's impairments limit his cognitive functioning.  (See generally, AR 968–70, 979, 983–84.)  Finally, as with the physical RFC determination, the ALJ also evaluated the medical opinions of each physician as they pertained to Plaintiff's mental impairments during each time period, as detailed *supra*, and cited to these opinions in support of the mental RFC determination.

On this record, the Court finds the ALJ's RFC determination—as to both physical and mental impairments, during each of the three time periods identified by the ALJ—are well-supported by multiple citations to the objective medical evidence and medical opinions, which constitute substantial evidence.  Stubbs-Danielson, 539 F.3d at 1173–74.

///

///

1       4.    <u>The ALJ Provided Specific and Legitimate Reasons for Discounting Dr. McLain's</u>
2                  <u>Opinions</u>

3       As previously noted, if a treating or examining physician's opinion is contradicted by

4   either the medical record or other doctors' opinions, the ALJ must provide specific and legitimate

5   reasons supported by substantial evidence in the record for discounting the opinion.  <u>Bayliss</u>, 427

6   F.3d at 1216; <u>Lester</u>, 81 F.3d at 830–31; <u>Andrews</u>, 53 F.3d at 1041.  Here, the ALJ discounted Dr.

7   McLain's mental and physical opinions because he found them to be unsupported by and

8   inconsistent with the medical record (as discussed extensively in the ALJ's opinion at AR 968–

9   69, 971–76, 980–81, 982, 985–88) and the medical opinions of other examining and reviewing

10  physicians, as discussed herein.

11      **a.**    **Mental RFC**

12      With respect to Plaintiff's mental impairments, Dr. McLain submitted one mental

13  impairment questionnaire on May 15, 2018, which is purportedly applicable to all three time

14  periods addressed by the ALJ—(1) prior to May 24, 2016, (2) from May 24, 2016 to August 3,

15  2017, and (3) starting August 4, 2017—though the time period to which the opinion refers is not

16  expressly provided and is therefore ambiguous.[15]

17      In expressly referring to Dr. McLain's opinion as a "questionnaire," the ALJ first suggests

18  the opinion is internally inconsistent, because it identifies mild and moderate impairments, but

19  then opines "over-restrictive" limitations—such as two 2-week decompensation periods per year,

20  and four days of absences from work per month, due to fully-debilitating mental impairments—

21

22  [15] Defendant argues Dr. McClain's opinion was dated May 15, 2018, but does not state anywhere that the opinion
    regarding Plaintiff's functional limitations is retroactive.  To this point, the Court notes the Ninth Circuit has affirmed
23  an ALJ's discounting of a medical opinion where it was based on a medical questionnaire completed years after the
    relevant period and, as here, was ambiguous on its face as to whether it referred to the claimant's contemporaneous
24  condition or his condition from the entire relevant period onwards.  <u>See</u> Jones v. Saul, 783 Fed. App'x 754, 755 (9th
    Cir. 2019).  Indeed, in upholding the ALJ's interpretation of the medical questionnaire as pertaining to the claimant's
25  contemporaneous condition rather than the relevant period, the Ninth Circuit in <u>Jones</u> expressly noted it is the ALJ's
    duty to resolve such ambiguities in the medical evidence.  <u>Id.</u> (citing <u>Tommasetti</u>, 533 F.3d at 1041; <u>Burch</u>, 400 F.3d
26  at 679).  Here, the ALJ does, at times when evaluating the medical opinions and record, note that certain findings or
    allegations were weighted less than others where they appear temporally inconsistent.  For example, the ALJ notes
27  Plaintiff's allegations of ankle pain are less persuasive with respect to the time period prior to the date he fractured
    his ankle.  The ALJ does not, however, make an express finding as to the time period reflected in Dr. McClain's
28  opinion as a basis for discounting her opinion, and the Court is constrained to review the reasons the ALJ asserts.
    <u>Connett</u>, 340 F.3d at 874 (citations omitted).

1    that lack support.  (AR 975.)  As previously noted, an ALJ may reject a treating physician's

2    opinion if it is brief, conclusory, and inadequately supported by clinical findings.  Bray, 554 F.3d

3    at 1228; Thomas, 278 F.3d at 957.  Furthermore, while an opinion cannot be rejected merely for

4    being expressed as answers to a check-the-box questionnaire, Popa v. Berryhill, 872 F.3d 901,

5    907 (9th Cir. 2017), the Ninth Circuit has nevertheless held "the ALJ may permissibly reject

6    check-off reports that do not contain any explanation of the bases of their conclusions."  Ford,

7    950 F.3d at 1155 (citations omitted).  Thus, the ALJ properly discounted Dr. McLain's opinion on

8    the basis that it was conclusory and the proffered limitations were not explained or supported by

9    her findings.

10          The ALJ also discounted Dr. McLain's opinion because it is inconsistent with the medical

11    record.  For example, the ALJ noted Dr. McLain's opinion is inconsistent with medical records

12    from the period prior to May 24, 2016, such as the generally unremarkable reviews of the

13    psychiatric system and a September 2015 report showing Plaintiff demonstrated normal insight

14    and communication.  (AR 975 (citing AR 353, 355, 390).)  For the period starting August 4,

15    2017, the ALJ notes the opinion is inconsistent with additional unremarkable reviews of the

16    psychiatric system from that time period.  (AR 987 (citing AR 2634, 2779, 3063).)  This

17    constitutes a specific and legitimate reason supported by substantial evidence in the record for

18    discounting the opinion.  Bayliss, 427 F.3d at 1216; Lester, 81 F.3d at 830–31.

19          Finally, the ALJ discounted Dr. McLain's opinion as inconsistent with the other medical

20    opinions, as detailed *supra*.  This, too, constitutes a specific and legitimate reason supported by

21    substantial evidence in the record for discounting the opinion.  Andrews, 53 F.3d at 1041.

22          In challenging the ALJ's evaluation of Dr. McLain's opinions, the Court notes Plaintiff

23    initially specifies he is contesting the discounting of Dr. McLain's physical *and* mental opinions,

24    as they pertained to both the period to May 24, 2016, and after August 3, 2017; however, Plaintiff

25    makes no substantive argument regarding the mental RFC portion of the ALJ's decision, but

26    instead appears to focus only on his physical impairments, particularly his ankle pain.  (See

27    generally ECF No. 14 at 21–26.)  As Plaintiff does not assert any substantive argument discussing

28    the merits of the ALJ's evaluation of the mental medical opinions, his singular statement that the

1    ALJ failed to provide specific and legitimate reasons for discounting Dr. McLain's mental

2    questionnaire opinion is conclusory and therefore unpersuasive.

3         For these reasons, the Court finds the ALJ did not err in discounting Dr. McLain's mental

4    impairment questionnaire opinion.

5         **b.      Physical RFC**

6         With respect to Plaintiff's substantive challenges to the ALJ's physical RFC

7    determination, the Court notes it cannot clearly discern which period/s of time Plaintiff is

8    addressing in his substantive arguments, as Plaintiff does not expressly refer to the two separate

9    periods (*i.e.*, pre- versus post- injury).  However, the Court shall address Plaintiff's arguments

10   generally, as they were presented.

11        i.)      <u>Cherry-Picking Records</u>

12        First, Plaintiff argues the ALJ relied upon cherry-picked "normal examination findings" to

13   support his conclusion that Dr. McLain's opinions were not fully consistent with the medical and

14   other evidence or supported by objective evidence or clinical findings, while ignoring findings of

15   continued significant limitation.  (ECF No. 14 at 21–22 (citing AR 491, 473–74).)  For example,

16   Plaintiff argues the ALJ did not discuss Dr. McLain's treatment notes.  But the ALJ "need not

17   discuss *all* evidence presented to [him].  Rather [he] must explain why 'significant probative

18   evidence has been rejected.' "  <u>Vincent v. Heckler</u>, 739 F.2d 1393, 1394–95 (9th Cir. 1984)

19   (emphasis in original) (affirming ALJ decision where "the evidence which the Secretary ignored

20   was neither significant nor probative."); <u>see also</u> <u>Howard v. Barnhart</u>, 341 F.3d 1006, 1012 (9th

21   Cir. 2003) (ALJ is not required to discuss every piece of evidence).  Importantly, Dr. McLain's

22   notes indicate she treated Plaintiff's back and leg pain, depression, anxiety, agoraphobia, ADHD

23   and alleged mental retardation (<u>see</u>, <u>e.g.</u>, AR 381 (Plaintiff's first encounter with Dr. McLain on

24   November 6, 2015, in which she advised weight loss and exercise and prescribed medications))—

25   these are all impairments and symptoms which were discussed and considered in the ALJ's

26   decision.

27        In another example, Plaintiff argues the ALJ did not consider and discuss his continued

28   pain related to a "great toe tendon release" occurring after the ankle fracture.  (ECF No. 17 at 5.)

This is not accurate.  The medical treatment notes indicate Plaintiff underwent great toe tendon release surgery at the beginning of June 2017.  (See, e.g., AR 473.)  The notes state Plaintiff complained of right ankle hypomobility weakness and pain, increased swelling, and soft tissue restrictions, resulting in difficulty walking and recreational activities, and limited range of motion. (AR 477.)  In physical therapy, Plaintiff was educated in proper posture, body mechanics and pacing, the proper use of modalities and pain controlling techniques such as diaphragmatic breathing, and was assigned a home exercise routine.  (Id.)  The treatment note also indicates Plaintiff's rehabilitation potential is good.  (Id.)  While the ALJ does not address Plaintiff's "great toe tendon release" specifically by name, he *does* discuss Plaintiff's surgery and physical therapy, and Plaintiff's related allegations of continued swelling and pain.  (See AR 982, 985–86.)  In discussing the record and medical opinions, the ALJ acknowledges the continuing reports of some issues and pain with the ankle, but also notes Plaintiff's pain readings fluctuate, that later strength in ankles was noted as full (five out of five), that x-rays taken during this period showed further interval healing of the distal tibial and fibular fractures, and Dr. Lorber's expert testimony all support the finding that function was no longer impaired beyond what was noted outside of the period from May 24, 2016 through August 3, 2017.  (AR 985–86 (citing AR 3078, 3100, 3121–22, 3402–03, 3425).)  Thus, the ALJ concluded medical improvement had occurred as of August 4, 2017, which is approximately two months after Plaintiff's great toe surgery.  On this record, the Court does not find the ALJ failed to consider any significant or probative evidence.  Furthermore, as previously noted, it is within the ALJ's province to synthesize the medical evidence.  See Lingenfelter, 504 F.3d at 1042 ("When evaluating the medical opinions of treating and examining physicians, the ALJ has discretion to weigh the value of each of the various reports, to resolve conflicts in the reports, and to determine which reports to credit and which to reject."); Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 603 (9th Cir. 1999) (holding that ALJ was "responsible for resolving conflicts" and "internal inconsistencies" within doctor's reports); Tommasetti, 533 F.3d at 1041–42 ("[T]he ALJ is the final arbiter with respect to resolving ambiguities in the medical evidence.").  Furthermore, where evidence exists to support more than one rational interpretation, the Court must defer to the decision of the ALJ.  Drouin v.

1   Sullivan, 966 F.2d 1255, 1258 (9th Cir. 1992); Burch, 400 F.3d at 679.   Here, the ALJ's

2   conclusions were supported by substantial evidence, and the Court cannot say that his

3   interpretation of the available evidence was not rational.   Shaibi v. Berryhill, 883 F.3d 1102, 1108

4   (9th Cir. 2017).   Thus, the Court finds Plaintiffs' cherry-picking argument unavailing.

5        Plaintiff also contests one of the ALJ's "normal" findings, arguing one of the notes the

6   ALJ refers to as yielding normal tests actually indicates "no tests were performed."   (ECF No. 14

7   at 22–23 (citing AR 610–16).)   The Court notes this is the exact same argument Plaintiff asserted

8   in his original appeal, which the district court previously granted.   The difference between the two

9   ALJ opinions, however, is that the original ALJ opinion cited only to the one disputed treatment

10   note in support of the decision to discount Dr. McLain's opinion; whereas here, the ALJ's

11   decision on remand cites to multiple notes demonstrating normal examination findings, the vast

12   majority of which Plaintiff has not contested.   Furthermore, the Court has reviewed the December

13   21, 2017 treatment note with which Plaintiff expressly takes issue, and does not find the ALJ

14   mischaracterized the findings therein.   Indeed, the Court cannot find any comment in this

15   treatment note indicating that "no tests were performed."   To the contrary, the record indicates

16   Plaintiff was seen by Dr. McLain that day with complaints of a panic disorder after he had a panic

17   attack on the day on which he was scheduled to have an MRI taken.   (AR 610.)   Dr. McLain

18   prescribed medications and rescheduled Plaintiff's MRI.   She also advised Plaintiff to change his

19   diet, exercise more, and lose weight.   (AR 610–11.)   And she addressed Plaintiff's complaints of

20   experiencing ankle pain when he plays golf, advising Plaintiff to wear an ACE bandage and ankle

21   brace before engaging in physical activity if his ankle pain was severe.   (AR 611.)   Importantly,

22   the treatment note reflects Dr. McLain *did* perform a physical examination of Plaintiff during this

23   encounter, and noted "normal" findings as to the psychiatric portion of the examination; namely,

24   that Plaintiff appeared oriented to time, place, person & situation, had appropriate mood and

25   affect, normal insight, and normal judgment (she also noted Plaintiff's memory was normal)—the

26   is the exact portion of the treatment note referenced by the ALJ in his decision, for these exact

27   findings.   Plaintiff's argument is therefore unavailing.

28   ///

1

       ii.)    <u>Plaintiff's Golfing Activities</u>

2

      With respect to the ALJ's consideration of Plaintiff's ADLs, Plaintiff argues the ALJ's

3 finding that he was "noted to be ambulatory, experiencing pain only when walking or playing

4 golf" is contradicted by Plaintiff's testimony that he has not played golf in eight years.  (ECF No.

5 14 at 23 (citing AR 982).)  Further, Plaintiff contends the ALJ has mischaracterized the evidence

6 because all medical notes that refer to his playing golf pertain to the time before his ankle injury

7 and surgery.  (<u>Id</u>.)  Therefore, Plaintiff argues his ADLs do not constitute substantial evidence to

8 support discounting Dr. McLain's opinion.  Alternatively, Plaintiff argues it is inappropriate for

9 the ALJ to consider his golfing activities in evaluating Dr. McLain's opinions as to the severity of

10 Plaintiff's impairments and his functionality because it was Plaintiff's physical therapists who

11 recommended that Plaintiff engage in some "light golfing activity" as a "good way to increase his

12 tolerance for weight bearing and improve his active ankle ROM."  (<u>Id</u>.)  Further, Plaintiff argues

13 his physical therapy golfing is not an activity that is transferrable to a work environment.  (<u>Id</u>. at

14 23–24.)  Thus, Plaintiff concludes, his ADLs are more limited than the ALJ makes them out to be.

15 (<u>Id</u>. at 23.)

16

      The Court expresses some bewilderment as to this argument.  First, it remains unclear

17 which RFC time period Plaintiff is contesting.  To the extent Plaintiff is challenging the RFC

18 determination for the time period occurring before his May 24, 2016 ankle fracture, Plaintiff's

19 argument appears inapplicable because the ALJ does not discuss Plaintiff's golf-playing practices

20 in support of his physical RFC determination for this time period.  (<u>See</u> AR 971–73.)  Indeed, the

21 ALJ only considers Plaintiff's ability to play golf as it related to his finding of Plaintiff's

22 improved physical condition as of August 4, 2017.  (<u>See</u> AR 982, 988.)  As to this time period,

23 Plaintiff's premise is incorrect: notably, the ALJ expressly notes Plaintiff's April 6, 2021

24 testimony of last playing golf eight years ago (<i>i.e.</i>, sometime in 2013), but notes this testimony is

25 in direct conflict with a report from February 2019, in which Plaintiff complained of ankle pain

26 when playing golf.  (AR 989 (citing AR 2858).)  There are other examples.  In particular, the

27 Court notes one of Dr. McLain's treatment notes expressly referenced by Plaintiff, for an

28 encounter on December 21, 2017, notes both Plaintiff's history of ankle fracture, and his

complaint of pain when he plays golf.  (AR  613 (Dr. McLain advised Plaintiff should wear an ace bandage).)

In any event, Ninth Circuit caselaw demonstrates that ADLs may be grounds for discounting allegations that an impairment is so severe it is totally debilitating, even if they are not directly transferrable to a work setting.  See Molina v. Astrue, 674 F.3d 1104, 1112–13 (9th Cir. 2012), superseded by regulation on other grounds)) (noting "the ALJ may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capacities that are transferrable to a work setting … Even where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment.") (internal citations omitted); Valentine v. Comm'r Soc. Sec. Admin., 574 F.3d 685, 693 (9th Cir. 2009) (same); Ford, 950 F.3d at 1155 ("A conflict between a treating physician's opinion and a claimant's activity level is a specific and legitimate reason for rejecting the opinion."); Rollins v. Massanari, 261 F.3d 853, 856 (9th Cir. 2001) (affirming ALJ's rejection of treating source opinion of disabling limitations as inconsistent with the claimant's ability to perform daily and weekly activities); see also Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989) ("if, despite his claims of pain, a claimant is able to perform household chores and other activities that involve many of the same physical tasks as a particular type of job, it would not be farfetched for an ALJ to conclude that the claimant's pain does not prevent the claimant from working.").  Here, an advisement from a medical treatment provider to play golf reasonably arises from a medical opinion that Plaintiff was physically *capable* of playing golf; this is a specific and legitimate reason to discount a contradictory medical opinion that Plaintiff's physical impairments are completely disabling.  See Molina, 674 F.3d at 1112–13; Ford, 950 F.3d at 1155.

iii.)    ALJ's Reliance on Non-Examining State Agency Consultant Opinions

Plaintiff also argues the ALJ improperly rejected Dr. McLain's opinions as inconsistent with the stale medical opinions of non-examining State agency consultants, because these opinions cannot constitute substantial evidence for discounting a treating physician's medical opinion.  (ECF No. 14 at 24–25.)  However, the Court notes the ALJ only accorded some weight

to the opinions of the various state agency consultant opinions, and always on the basis that he found Plaintiff's impairments required greater limitations than opined by these physicians. Furthermore, as the Court noted, the Ninth Circuit has held that a non-examining opinion may constitute substantial evidence if it is consistent with other independent evidence in the record, and the ALJ is to resolve the conflict.  See Thomas, 278 F.3d at 957; Orn, 495 F.3d at 632–33; Andrews, 53 F.3d at 1041.  As previously discussed, the ALJ discounted Dr. McLain's opinions because they were inconsistent with both the objective medical evidence and the opinions of other physicians.  Therefore, Plaintiff's argument is unavailing.

   iv.) Argument There was No Medical Improvement/Substantial Evidence to Support the ALJ's Physical RFC Determination for the Period Beginning August 4, 2017

  Finally, based on the premise that the ALJ improperly rejected Dr. McLain's opinions, Plaintiff argues there is no evidence of any medical improvement with respect to his ankle. Therefore, the RFC determination for the period beginning August 4, 2027, is unsupported by substantial evidence.  (ECF No. 14 at 25–26.)  This argument is unavailing.

  As detailed and discussed explicitly herein, the Court finds both the physical and mental RFC determinations were amply supported by the record.  With specific regard to the physical RFC determination for the period beginning August 4, 2017, the ALJ cited extensively to the medical record and medical opinions for a full three pages of his twenty-eight-page decision, expressly discussing the support for the physical RFC determination for this time period, as the Court has also previously detailed.  (AR 983, 985–86.)  Thus, to the extent Plaintiff is rehashing his prior arguments related to the ALJ's evaluation of the medical opinions and record evidence, Plaintiff's argument fails.  See Stubbs-Danielson, 539 F.3d at 1175–76 (rejecting a step five argument that "simply restates" arguments about medical evidence and testimony); see also Embrey v. Bowen, 849 F.2d 418, 423 (9th Cir. 1988) (acknowledging there is no requirement that testimony for which the ALJ has provided specific and legitimate reasons to discount be included in the hypothetical given the VE).  Furthermore, to the extent Plaintiff has suggested an alternative interpretation of the evidence, this is not sufficient to establish reversible error and the Court "will not engage in second-guessing."  Thomas, 278 F.3d at 959; Ford, 950 F.3d at 1154;

Burch, 400 F.3d at 679 (citations omitted).  Accordingly, the Court finds the ALJ did not err in his evaluation of the medical opinions; thus, the Court finds the ALJ's RFC determination is supported by substantial evidence in the medical record.

**B.    Credibility Determination**

Plaintiff argues the ALJ's credibility determination is not supported by substantial evidence.  (ECF No. 14 at 26–28.)

1.    Plaintiff's Testimony

At the April 6, 2021 hearing, Plaintiff testified he currently takes hydrocodone and Buspar for pain; Quetiapiene, Sluovetine, Hydxydine, and Gabapentin for anxiety, depression and nerves; Stiolto for allergies; and uses an inhaler and nebulizer for his asthma.  (AR 1016–18.)  Plaintiff does not use any assistive devices for walking.  (AR 1019.)  Plaintiff testified that the last time he played golf was eight years ago.  (AR 2020.)  Plaintiff testified he was scared to seek new work after he quit his last job in 2011 because he did not think he could adapt to a new environment. (AR 1046.)  Plaintiff previously lived with his grandmother, but now lives with his partner and his daughter.  (Id.)  Plaintiff testified he is more anxious now than he was in 2011 and has difficulty going out in public; he does not leave the house often.  (AR 1047, 1064–65.)  Plaintiff alleges he continues to suffer from swelling in his right ankle despite applying an ace bandage. (AR 1048.)  Plaintiff testified he elevates his leg every hour and a half for thirty minutes.  (AR 1048–49.)  He alleges breathing problems after thirty minutes of physical activity, and uses his inhaler all day long.  (AR 1062–63.)  He claims he is depressed every day.  (AR 1063–64.)

2.    The ALJ's Evaluation of Plaintiff's Testimony

In discounting Plaintiff's testimony, the ALJ explained:

> [As to the period prior to May 24, 2016,] the claimant's statements and allegations are not fully consistent with the medical and other evidence … For example, he alleged his ability to work is significantly limited because of an injury to his right ankle (see Exhibit 23E, p. 6; hearing testimony), but the evidence from prior to May 24, 2016 does not support this.  In fact, it was not until that date, that the claimant actually injured is right ankle.  The claimant further alleges suffering from significant mental limitations (see Exhibits 5E; 10E; 23E), which prohibit work, but that is inconsistent with the findings and opinions of Drs. Akins (hearing testimony), Swanson (see Exhibit 3F), Amado (see Exhibit 1A),

Schwartz (see Exhibit 9A), and Jacobs (see Exhibit 13A).

In sum, the above residual functional capacity assessment for the period prior to May 24, 2016 is supported by the overall medical evidence of record for the reasons discussed above. The medical evidence of record does not support the extent of the claimant's subjective complaints and his statements and allegations are not fully consistent with the medical and other evidence from that period.

…

[As to the period beginning August 4, 2017,] the claimant's statements and allegations are not fully consistent with the medical and other evidence … For example, overall, the claimant alleges suffering from significant limitations, which prohibit him from working (see Exhibits 3E, p. 2; 5E; 8E, p. 2; 20E, p. 2; 23E; 26E, p. 2; 28E; hearing testimony), but that is inconsistent with the expert opinions of Drs. Lorber and Akins (hearing testimony). The allegation is also inconsistent with the record, which showed he is able to complete his personal care without assistance, he performs household chores and his hobbies include playing video games and watching television and movies (Exhibit 54F, pp. 1-3).

As noted by the District Court, the claimant stated he had right ankle pain and swelling after breaking his ankle and that even after surgery and physical therapy, he is unable to "stand too long" (Exhibit 11A, p. 17). He further indicated he continues to wear an ankle brace and elevates his leg for an hour each day (Exhibit 11A, p. 17). However, that is inconsistent with treatment reports showing a normal gait, with normal cranial nerves, no evidence of motor weakness, normal deep tendon reflexes, and no sensory deficit (see Exhibits 28F, pp. 7-8; 29F, pp. 7-8). It is also inconsistent with reports showing full strength in the lower extremities (see Exhibit 38F, p. 9; 41F, pp. 9-10) with no pedal edema or clubbing in the extremities (see Exhibit 53F, pp. 1-2). In addition, the alleged limitations are inconsistent with the claimant's playing golf (Exhibit 34F, p. 2). With regard to golf, I note that during the hearing, he testified to last playing golf eight years ago, but that is in direct conflict with a report from February of 2019, which showed he complained of ankle pain when playing golf (Exhibit 34F, p. 2).

In sum, the above residual functional capacity assessment for the period beginning August 4, 2017 is supported by the overall medical evidence of record for the reasons discussed above. The medical evidence of record does not support the extent of the claimant's subjective complaints and his statements and allegations are not fully consistent with the medical and other evidence from that period.

(AR 977, 988–89.)

///

3.    Legal Standard[16]

The ALJ is responsible for determining credibility,[17] resolving conflicts in medical testimony, and resolving ambiguities.  Andrews, 53 F.3d at 1039.  A claimant's statements of pain or other symptoms are not conclusive evidence of a physical or mental impairment or disability.  42 U.S.C. § 423(d)(5)(A); SSR 16-3p; see also Orn, 495 F.3d at 635 ("An ALJ is not required to believe every allegation of disabling pain or other non-exertional impairment.").

Rather, an ALJ performs a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible.  See Garrison v. Colvin, 759 F.3d 995, 1014 (9th Cir. 2014); Smolen, 80 F.3d at 1281; SSR 16-3p, at *3.  First, the claimant must produce objective medical evidence of an impairment that could reasonably be expected to produce some degree of the symptom or pain alleged.  Garrison, 759 F.3d at 1014; Smolen, 80 F.3d at 1281–82.  If the claimant satisfies the first step and there is no evidence of malingering, "the ALJ may reject the claimant's testimony about the severity of those symptoms only by providing specific, clear, and convincing reasons for doing so."  Lambert v. Saul, 980 F.3d 1266, 1277 (9th Cir. 2020) (citations omitted).

> If an ALJ finds that a claimant's testimony relating to the intensity of his pain and other limitations is unreliable, the ALJ must make a credibility determination citing the reasons why the testimony is unpersuasive.  The ALJ must specifically identify what testimony is credible and what testimony undermines the claimant's complaints. In this regard, questions of credibility and resolutions of conflicts in the testimony are functions solely of the Secretary.

Valentine, 574 F.3d at 693 (quotation omitted); see also Lambert, 980 F.3d at 1277.

Subjective pain testimony "cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence," but the medical evidence "is still a relevant factor in determining the severity of claimant's pain and its disabling effects."  Burch, 400 F.3d at 680–81;

---

[16]   Although Defendant emphasizes disagreement with the "clear and convincing reasons" standard in order to preserve the issue for future appeals, Defendant acknowledges it is the applicable standard for weighing credibility in the Ninth Circuit.  (ECF No. 16 at 20 n.6.)

[17]   SSR 16-3p applies to disability applications heard by the agency on or after March 28, 2016.  Ruling 16-3p eliminated the use of the term "credibility" to emphasize that subjective symptom evaluation is not "an examination of an individual's character" but an endeavor to "determine how symptoms limit ability to perform work-related activities."  SSR 16-3p, at *1-2.

Rollins, 261 F.3d at 857; SSR 16-3p (citing 20 C.F.R. § 404.1529(c)(2)).  The ALJ must examine the record as a whole, including objective medical evidence; the claimant's representations of the intensity, persistence and limiting effects of his symptoms; statements and other information from medical providers and other third parties; and any other relevant evidence included in the individual's administrative record.  SSR 16-3p, at *5.

Additional factors an ALJ may consider include the location, duration, and frequency of the pain or symptoms; factors that cause or aggravate the symptoms; the type, dosage, effectiveness or side effects of any medication; other measures or treatment used for relief; conflicts between the claimant's testimony and the claimant's conduct—such as daily activities, work record, or an unexplained failure to pursue or follow treatment—as well as ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, internal contradictions in the claimant's statements and testimony, and other testimony by the claimant that appears less than candid.  See Ghanim v. Colvin, 763 F.3d 1154, 1163 (9th Cir. 2014); Tommasetti, 533 F.3d at 1039; Lingenfelter, 504 F.3d at 1040; Smolen, 80 F.3d at 1284.

Finally, so long as substantial evidence supports the ALJ's assessment of a claimant's subjective complaint, the Court "will not engage in second-guessing."  Thomas, 278 F.3d at 959.

In this case, there is no dispute that Plaintiff had the severe impairments of borderline intellectual functioning, an anxiety disorder, ADHD, agoraphobia, depression, asthma, obesity, and peripheral vascular disease during the time periods prior to May 24, 2016; Plaintiff had those same impairments, plus a right ankle fracture, status post open reduction and internal fixation, beginning August 4, 2017; and that Plaintiff's impairments "could reasonably be expected to produce the claimant's pain or other symptoms."  (AR 967, 976, 982–83.)  As a result, the ALJ was required to make a credibility finding as to Plaintiff's own testimony.  Valentine, 574 F.3d at 693; Lambert, 980 F.3d at 1277.  Because the ALJ made no finding that Plaintiff was malingering, he was required to give clear and convincing reasons as to why he did not find Plaintiff's subjective contentions about his limitations to be persuasive.  Id.

4.    Analysis

Plaintiff raises his challenge to the ALJ's credibility determination almost as an

afterthought.  In fairly conclusory fashion, Plaintiff argues the ALJ only presented a boilerplate statement that Plaintiff's symptoms were not entirely consistent with the medical evidence, and a few "cherry-picked" normal medical examinations and activities of daily living in support of his adverse credibility finding.  (ECF No. 14 at 27–28.)  Notably, Plaintiff does not identify which examinations he contends were "cherry-picked," nor does he identify non-normal medical examinations or other evidence from the record to support his contention that the ALJ mischaracterized the record.  Instead, Plaintiff merely concludes the ALJ's reasons for discounting his testimony are insufficient to constitute substantial evidence in support of the ALJ's decision.  The Court disagrees.

It seems apparent from the ALJ's decision, quoted *supra*, that a considerable number of citations to the record support the ALJ's findings that Plaintiff's testimony is inconsistent with the medical evidence of record, his activities of daily living, and medical opinion evidence.  As the Court previously addressed Plaintiff's arguments regarding the ALJ's consideration of the medical record and his activities and found the ALJ's decision to be supported by substantial evidence, the Court similarly concludes the ALJ made specific citations to the administrative record that demonstrate clear and convincing reasons to find Plaintiff had more functional ability than he alleged, thus weakening his credibility.  Burrell v. Colvin, 775 F.3d 1133, 1136 (9th Cir. 2014); SSR 16-3p, at *10.  Accordingly, the Court finds the ALJ provided clear and convincing reasons supported by substantial evidence for discounting Plaintiff's symptom testimony.  Plaintiff's conclusory arguments to the contrary are therefore unavailing.

## VI.

### CONCLUSION AND ORDER

Based on the foregoing, the Court finds the ALJ's decision to be supported by substantial evidence in the administrative record, and free from remandable legal error.

///

///

///

///

49

1        Accordingly, IT IS HEREBY ORDERED that Plaintiff's appeal from the decision of the

2    Commissioner of Social Security (ECF No. 14)  is DENIED.  It is FURTHER ORDERED that

3    judgment be entered in favor of Defendant Commissioner of Social Security and against Plaintiff

4    Francisco Michael McElfresh.  The Clerk of the Court is DIRECTED to CLOSE this action.

5

6    IT IS SO ORDERED.

7    Dated:   **December 19, 2022**    _____

8                                           UNITED STATES MAGISTRATE JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28